Justice Breyer
delivered the opinion of the Court.
The question before us is whether an assignee of a legal claim for money owed has standing to pursue that claim in federal court, even when the assignee has promised to remit the proceeds of the litigation to the assignor. Because history and precedent make clear that such an assignee has long been permitted to bring suit, we conclude that the assignee does have standing.
I
When a payphone customer makes a long-distance call with an access code or 1-800 number issued by a long-distance communications carrier, the customer pays the carrier (which completes that call), but not the payphone operator (which connects that call to the carrier in the first place). In these circumstances, the long-distance carrier is required to compensate the payphone operator for the customer’s call. See 47 U. S. C. § 226; 47 CFR § 64.1300 (2007). The payphone operator can sue the long-distance carrier in court for any compensation that the carrier fails to pay for these “dial-around” calls. And many have done so. See Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc., 550 U. S. 45 (2007) (finding that the Communications Act of 1934 authorizes such suits).
Because litigation is expensive, because the evidentiary demands of a single suit are often great, and because the resulting monetary recovery is often small, many payphone operators assign their dial-around claims to billing and collection firms called “aggregators” so that, in effect, these *272 aggregators can bring suit on their behalf. See Brief for Respondents 3. Typically, an individual aggregator collects claims from different payphone operators; the aggregator promises to remit to the relevant payphone operator (i. e., the assignor of the claim) any dial-around compensation that is recovered; the aggregator then pursues the claims in court or through settlement negotiations; and the aggregator is paid a fee for this service.
The present litigation involves a group of aggregators who have taken claim assignments from approximately 1,400 payphone operators. Each payphone operator signed an Assignment and Power of Attorney Agreement (Agreement) in which the payphone operator “assigns, transfers and sets over to [the aggregator] for purposes of collection all rights, title and interest of the [payphone operator] in the [payphone operator’s] claims, demands or causes of action for ‘Dial-Around Compensation’ . . . due the [payphone operator] for periods since October 1, 1997.” App. to Pet. for Cert. 114. The Agreement also “appoints” the aggregator as the payphone operator’s “true and lawful attorney-in-fact.” Ibid. The Agreement provides that the aggregator will litigate “in the [payphone operator’s] interest.” Id., at 115. And the Agreement further stipulates that the assignment of the claims “may not be revoked without the written consent of the [aggregator].” Ibid. The aggregator and payphone operator then separately agreed that the aggregator would remit all proceeds to the payphone operator and that the payphone operator would pay the aggregator for its services (typically via a quarterly charge).
After signing the agreements, the aggregators (respondents here) filed lawsuits in federal court seeking dial-around compensation from Sprint, AT&T, and other long-distance carriers (petitioners here). AT&T moved to dismiss the claims, arguing that the aggregators lack standing to sue under Article III of the Constitution. The District Court initially agreed to dismiss, APCC Servs., Inc. v. AT&T Corp., *273 254 F. Supp. 2d 135, 140-141 (DC 2003), but changed its mind in light of a “long line of cases and legal treatises that recognize a well-established principle that assignees for collection purposes are entitled to bring suit where [as here] the assignments transfer absolute title to the claims.” APCC Servs., Inc. v. AT&T Corp., 281 F. Supp. 2d 41, 45 (DC 2003). After consolidating similar cases, a divided panel of the Court of Appeals for the District of Columbia Circuit agreed that the aggregators have standing to sue, but held that the relevant statutes do not create a private right of action. APCC Servs., Inc. v. Sprint Communications Co., 418 F. 3d 1238 (2005) (per curiam). This Court granted the aggregators’ petition for certiorari on the latter statutory question, vacated the judgment, and remanded the case for reconsideration in light of Global Crossing, supra. APCC Services, Inc. v. Sprint Communications Co., 550 U. S. 901 (2007). On remand, the Court of Appeals affirmed the orders of the District Court allowing the litigation to go forward. 489 F. 3d 1249, 1250 (2007) (per curiam). The long-distance carriers then asked us to consider the standing question. We granted certiorari, and we now affirm.
II
We begin with the most basic doctrinal principles: Article III, §2, of the Constitution restricts the federal “judicial Power” to the resolution of “Cases” and “Controversies.” That case-or-controversy requirement is satisfied only where a plaintiff has standing. See, e. g., Daimler Chrysler Corp. v. Cuno, 547 U. S. 332 (2006). And in order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (i. e., a “concrete and particularized” invasion of a “legally protected interest”); (2) causation (i e., a “ ‘fairly ... trace[able]’” connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redress-ability (i. e., it is “ ‘likely’ ” and not “merely ‘speculative’ ” that the plaintiff’s injury will be remedied by the relief plain *274 tiff seeks in bringing suit). Lujan v. Defenders of Wildlife, 504 U. S. 555, 560-561 (1992) (calling these the “irreducible constitutional minimum” requirements).
In some sense, the aggregators clearly meet these requirements. They base their suit upon a concrete and particularized “injury in fact,” namely, the carriers’ failure to pay dial-around compensation. The carriers “caused” that injury. And the litigation will “redress” that injury — if the suits are successful, the long-distance carriers will pay what they owe. The long-distance carriers argue, however, that the aggregators lack standing because it was the payphone operators (who are not plaintiffs), not the aggregators (who are plaintiffs), who were “injured in fact” and that it is the payphone operators, not the aggregators, whose injuries a legal victory will truly “redress”: The aggregators, after all, will remit all litigation proceeds to the payphone operators. Brief for Petitioners 18. Thus, the question before us is whether, under these circumstances, an assignee has standing to pursue the assignor’s claims for money owed.
We have often said that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider. See, e. g., Steel Co. v. Citizens for Better Environment, 523 U. S. 83, 102 (1998) (“We have always taken [the case-or-controversy requirement] to mean cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process” (emphasis added)); GTE Sylvania, Inc. v. Consumers Union of United States, Inc., 445 U. S. 375, 382 (1980) (“The purpose of the case-or-controversy requirement is to limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process” (emphasis added; internal quotation marks omitted)); cf. Coleman v. Miller, 307 U. S. 433, 460 (1939) (opinion of Frankfurter, J.) (in crafting Article III, “the framers . . . gave merely the outlines of what were to *275 them the familiar operations of the English judicial system and its manifestations on this side of the ocean before the Union”). Consequently, we here have carefully examined how courts have historically treated suits by assignors and assignees. And we have discovered that history and precedent are clear on the question before us: Assignees of a claim, including assignees for collection, have long been permitted to bring suit. A clear historical answer at least demands reasons for change. We can find no such reasons here, and accordingly we conclude that the aggregators have standing.
A
We must begin with a minor concession. Prior to the 17th century, English law would not have authorized a suit like this one. But that is because, with only limited exceptions, English courts refused to recognize assignments at all. See, e. g., Lampet’s Case, 10 Co. Rep. 46b, 48a, 77 Eng. Rep. 994, 997 (K. B. 1612) (stating that “no possibility, right, title, nor thing in action, shall be granted or assigned to strangers” (footnote omitted)); Penson & Higbed’s Case, 4 Leo. 99, 74 Eng. Rep. 756 (K. B. 1590) (refusing to recognize the right of an assignee of a right in contract); see also 9 J. Murray, Corbin on Contracts § 47.3, p. 134 (rev. ed. 2007) (noting that the King was excepted from the basic rule and could, as a result, always receive assignments).
Courts then strictly adhered to the rule that a “chose in action”—an interest in property not immediately reducible to possession (which, over time, came to include a financial interest such as a debt, a legal claim for money, or a contractual right)—simply “could not be transferred to another person by the strict rules of the ancient common law.” See 2 W. Blackstone, Commentaries *442. To permit transfer, the courts feared, would lead to the “multiplying of contentions and suits,” Lampet’s Case, supra, at 48a, 77 Eng. Rep., at 997, and would also promote “maintenance,” i. e., officious in *276 termeddling with litigation, see Holdsworth, History of the Treatment of Choses in Action by the Common Law, 33 Harv. L. Rev. 997, 1006-1009 (1920).
As the 17th century began, however, strict anti-assignment rules seemed inconsistent with growing commercial needs. And as English commerce and trade expanded, courts began to liberalize the rules that prevented assignments of choses in action. See 9 Corbin, supra, § 47.3, at 134 (suggesting that the “pragmatic necessities of trade” induced “evolution of the common law”); Holdsworth, supra, at 1021-1022 (the “common law” was “induced” to change because of “considerations of mercantile convenience or necessity”); J. Ames, Lectures on Legal History 214 (1913) (noting that the “objection of maintenance” yielded to “the modern commercial spirit”). By the beginning of the 18th century, courts routinely recognized assignments of equitable (but not legal) interests in a chose in action: Courts of equity permitted suits by an assignee who had equitable (but not legal) title. And courts of law effectively allowed suits either by the assignee (who had equitable, but not legal title) or the assignor (who had legal, but not equitable title).
To be more specific, courts of equity would simply permit an assignee with a beneficial interest in a chose in action to sue in his own name. They might, however, require the assignee to bring in the assignor as a party to the action so as to bind him to whatever judgment was reached. See, e. g., Warmstrey v. Tanfield, 1 Ch. Rep. 29, 21 Eng. Rep. 498 (1628-1629); Fashion v. Atwood, 2 Ch. Cas. 36, 22 Eng. Rep. 835 (1688); Peters v. Soame, 2 Vern. 428, 428-429, 23 Eng. Rep. 874 (Ch. 1701); Squib v. Wyn, 1 P. Wms. 378, 381, 24 Eng. Rep. 432, 433 (Ch. 1717); Lord Carteret v. Paschal, 3 P. Wms. 197, 199, 24 Eng. Rep. 1028, 1029 (Ch. 1733); Row v. Dawson, 1 Ves. sen. 331, 332-333, 27 Eng. Rep. 1064, 1064-1065 (Ch. 1749). See also M. Smith, Law of Assignment: The Creation and Transfer of Choses in Action 131 (2007) (by the beginning of the 18th century, “it became settled that *277 equity would recognize the validity of the assignment of both debts and of other things regarded by the common law as choses in action”).
Courts of law, meanwhile, would permit the assignee with an equitable interest to bring suit, but nonetheless required the assignee to obtain a “power of attorney” from the holder of the legal title, namely, the assignor, and further required the assignee to bring suit in the name of that assignor. See, e. g., Cook, Alienability of Choses in Action, 29 Harv. L. Rev. 816, 822 (1916) (“[C]ommon law lawyers were able, through the device of the ‘power of attorney’ ... to enable the assignee to obtain relief in common law proceedings by suing in the name of the assignor”); 29 R. Lord, Williston on Contracts § 74:2, pp. 214-215 (4th ed. 2003). Compare, e. g., Barrow v. Gray, Cro. Eliz. 551, 78 Eng. Rep. 797 (K. B. 1653), and South & Marsh’s Case, 3 Leo. 234, 74 Eng. Rep. 654 (Exch. 1686) (limiting the use of a power of attorney to cases in which the assignor owed the assignee a debt), with Holdsworth, supra, at 1021 (noting that English courts abandoned that limitation by the end of the 18th century). At the same time, courts of law would permit an assignor to sue even when he had transferred away his beneficial interest. And they permitted the assignor to sue in such circumstances precisely because the assignor retained legal title. See, e. g., Winch v. Keeley, 1 T. R. 619, 99 Eng. Rep. 1284 (K. B. 1787) (allowing the bankrupt assignor of a chose in action to sue a debtor for the benefit of the assignee because the assignor possessed legal, though not equitable, title).
The upshot is that by the time Blackstone published volume II of his Commentaries in 1766, he could dismiss the “ancient common law” prohibition on assigning choses in action as a “nicety ... now disregarded.” 2 Blackstone, supra, at *442.
B
Legal practice in the United States largely mirrored that in England. In the latter half of the 18th century and *278 throughout the 19th century, American courts regularly “exercised their powers in favor of the assignee,” both at law and in equity. 9 Corbin on Contracts §47.3, at 137. See, e. g., McCullum v. Coxe, 1 Dall. 139 (Pa. 1785) (protecting assignee of a debt against a collusive settlement by the assignor); Dennie v. Chapman, 1 Root 113, 115 (Conn. Super. 1789) (assignee of a nonnegotiable note can bring suit “in the name of the original promisee or his administrator”); Andrews v. Beecker, 1 Johns. Cas. 411, 411-412, n. (N. Y. Sup. Ct. 1800) (per curiam) (“Courts of law . . . are, in justice, bound to protect the rights of the assignees, as much as a court of equity, though they may still require the action to be brought in the name of the assignor”); Riddle & Co. v. Mandeville, 5 Cranch 322 (1809) (assignees of promissory notes entitled to bring suit in equity). Indeed, § 11 of the Judiciary Act of 1789 specifically authorized federal courts to take “cognizance of any suit to recover the contents of any promissory note or other chose in action in favour of an assignee” so long as federal jurisdiction would lie if the assignor himself had brought suit. 1 Stat. 79.
Thus, in 1816, Justice Story, writing for a unanimous Court, summarized the practice in American courts as follows: “Courts of law, following in this respect the rules of equity, now take notice of assignments of choses in action, and exert themselves to afford them every support and protection.” Welch v. Mandeville, 1 Wheat. 233, 236. He added that courts of equity have “disregarded the rigid strictness of the common law, and protected the rights of the assignee of choses in action,” and noted that courts of common law “now consider an assignment of a chose in action as substantially valid, only preserving, in certain cases, the form of an action commenced in the name of the assignor.” Id., at 237, n.
It bears noting, however, that at the time of the founding (and in some States well before then) the law did permit the assignment of legal title to at least some choses in action. *279 In such cases, the assignee could bring suit on the assigned claim in his own name, in a court of law. See, e. g., Act of Oct. 1705, Ch. XXXIV, 3 Va. Stat. 378 (W. Hening ed. 1823) (reprinted 1969) (permitting any person to “assign or transfer any bond or bill for debt over to any other person” and providing that “the assignee or assignees, his and their executors and administrators by virtue of such assignment shall and may have lawfull power to commence and prosecute any suit at law in his or their own name or names”); Act of May 28, 1715, Ch. XXVIII, Gen. Laws of Penn. 60 (J. Dunlop comp. 2d ed. 1849) (permitting the assignment of “bonds, specialties, and notes” and authorizing “the person or persons, to whom the said bonds, specialties or notes, are ... assigned” to “commence and prosecute his, her or their actions at law”); Patent Act of 1793, ch. 11, § 4, 1 Stat. 322 (“[I]t shall be lawful for any inventor, his executor or administrator to assign the title and interest in the said invention, at anytime, and the assignee . . . shall thereafter stand in the place of the original inventor, both as to right and responsibility”).
C
By the 19th century, courts began to consider the specific question presented here: whether an assignee of a legal claim for money could sue when that assignee had promised to give all litigation proceeds back to the assignor. During that century American law at the state level became less formalistic through the merger of law and equity, through statutes more generously permitting an assignor to pass legal title to an assignee, and through the adoption of rules that permitted any “real party in interest” to bring suit. See 6A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1541, pp. 320-321 (2d ed. 1990) (hereinafter Wright & Miller); see also 9 Corbin, supra, § 47.3, at 137. The courts recognized that pre-existing law permitted an assignor to bring suit on a claim even though the assignor retained nothing more than naked legal title. Since the law *280 increasingly permitted the transfer of legal title to an assignee, courts agreed that assignor and assignee should be treated alike in this respect. And rather than abolish the assignor’s well-established right to sue on the basis of naked legal title alone, many courts instead extended the same right to an assignee. See, e. g., Clark & Hutchins, The Real Party in Interest, 34 Yale L. J. 259, 264-265 (1925) (noting that the changes in the law permitted both the assignee with “naked legal title” and the assignee with an equitable interest in a claim to bring suit).
Thus, during the 19th century, most state courts entertained suits virtually identical to the litigation before us: suits by individuals who were assignees for collection only, i. e., assignees who brought suit to collect money owed to their assignors but who promised to turn over to those assignors the proceeds secured through litigation. See, e. g., Webb & Hepp v. Morgan, McClung & Co., 14 Mo. 428, 431 (1851) (holding that the assignees of a promissory note for collection only can bring suit, even though they lack a beneficial interest in the note, because the assignment “creates in them such legal interest, that they thereby become the persons to sue”); Meeker v. Claghorn, 44 N. Y. 349, 350, 353 (1871) (allowing suit by the assignee of a cause of action even though the assignors “‘expected to receive the amount recovered in the action,’” because the assignee, as “legal holder of the claim,” was “the real party in interest”); Searing v. Berry, 58 Iowa 20, 23, 24, 11 N. W. 708, 709 (1882) (where legal title to a judgment was assigned “merely for the purpose of enabling plaintiff to enforce its collection” and the assignor in fact retained the beneficial interest, the plaintiff-assignee could “prosecute this suit to enforce the collection of the judgment”); Grant v. Heverin, 77 Cal. 263, 265, 19 P. 493 (1888) (holding that the assignee of a bond could bring suit, even though he lacked a beneficial interest in the bond, and adopting the rule that an assignee with legal title to an assigned claim can bring suit even where the assignee must “account to the assignor” for “a part of the pro *281 ceeds” or “is to account for the whole proceeds” (internal quotation marks omitted)); McDaniel v. Pressler, 3 Wash. 636, 638, 637, 29 P. 209, 210 (1892) (holding that the assignee of promissory notes was the real party in interest, even though the assignment was “for the purpose of collection” and the assignee had “no interest other than that of the legal holder of said notes”); Wines v. Rio Grande W. R. Co., 9 Utah 228, 235, 33 P. 1042, 1044, 1045 (1893) (holding that an assignee could bring suit based on causes of action assigned to him “simply to enable him to sue” and who “would turn over to the assignors all that was recovered in the action, after deducting [the assignors’] proportion of the expenses of the suit”); Gomer v. Stockdale, 5 Colo. App. 489, 492, 39 P. 355, 357, 356 (1895) (permitting suit by a party who was assigned legal title to contractual rights, where the assignor retained the beneficial interest, noting that the doctrine that “prevails in Colorado” is that the assignee may bring suit in his own name “although there may be annexed to the transfer the condition that when the sum is collected the whole or some part of it must be paid over to the assignor”). See also Appendix, infra (collecting cases from numerous other States approving of suits by assignees for collection).
Of course, the dissent rightly notes, some States during this period of time refused to recognize assignee-forcollection suits, or otherwise equivocated on the matter. See post, at 309 (opinion of Roberts, C. J.). But so many States allowed these suits that by 1876, the distinguished procedure and equity scholar John Norton Pomeroy declared it “settled by a great preponderance of authority, although there is some conflict” that an assignee is “entitled to sue in his own name” whenever the assignment vests “legal title” in the assignee, and notwithstanding “any contemporaneous, collateral agreement by virtue of which he is to receive a part only of the proceeds ... or even is to thus account [to the assignor] for the whole proceeds.” Remedies and Remedial Rights § 132, p. 159 (internal quotation marks omitted; emphasis added). Other contemporary scholars reached the *282 same basic conclusion. See, e. g., P. Bliss, A Treatise Upon the Law of Pleading § 51, p. 69 (2d ed. 1887) (stating that “[m]ost of the courts have held that where negotiable paper has been indorsed, or other choses in action have been assigned, it does not concern the defendant for what purpose the transfer has been made” and giving examples of States permitting assignees to bring suit even where they lacked a beneficial interest in the assigned claims (emphasis added)). See also Clark & Hutchins, supra, at 264 (“[MJany, probably most, American jurisdictions” have held that “an assignee who has no beneficial interest, like an assignee for collection only, may prosecute an action in his own name” (emphasis added)). Even Michael Ferguson’s California Law Review Comment—which the dissent cites as support for its argument about “the divergent practice” among the courts, post, at 310 —recognizes that “[a] majority of courts has held that an assignee for collection only is a real party in interest” entitled to bring suit. See Comment, The Real Party in Interest Rule Revitalized: Recognizing Defendant’s Interest in the Determination of Proper Parties Plaintiff, 55 Cal. L. Rev. 1452, 1475 (1967) (emphasis added); see also id., at 1476, n. 118 (noting that even “[t]he few courts that have waivered on the question have always ended up in the camp of the majority” (emphasis added)).
During this period, a number of federal courts similarly indicated approval of suits by assignees for collection only. See, e. g., Bradford v. Jenks, 3 F. Cas. 1132, 1134 (No. 1,769) (CC Ill. 1840) (stating that the plaintiff, the receiver of a bank, could bring suit in federal court to collect on a note owed to that bank if he sued as the bank’s assignee, not its receiver, but ultimately holding that the plaintiff could not sue as an assignee because there was no diversity jurisdiction); Orr v. Lacy, 18 F. Cas. 834 (No. 10,589) (CC Mich. 1847) (affirming judgment for the plaintiff, the endorsee of a bill of exchange, on the ground that, as endorsee, he had the “legal right” to bring suit notwithstanding the fact that the pro *283 ceeds of the litigation would be turned over to the endorser); Murdock v. The Emma Graham, 17 F. Cas. 1012, 1013 (No. 9,940) (SD Ohio 1878) (permitting the assignee of a claim for injury to a “float or barge” to bring suit when, “under the assignment,” the assignor’s creditors would benefit from the litigation); The Rupert City, 213 F. 263, 266-267 (WD Wash. 1914) (assignees of claims for collection only could bring suit in maritime law because “an assignment for collection . . . vest[s] such an interest in [an] assignee as to entitle him to sue”).
Even this Court long ago indicated that assignees for collection only can properly bring suit. For example, in Waite v. Santa Cruz, 184 U. S. 302 (1902), the plaintiff sued to collect on a number of municipal bonds and coupons whose “legal title” had been vested in him but which were transferred to him “for collection only.” Id., at 324. The Court, in a unanimous decision, ultimately held that the federal courts could not hear his suit because the amount-in-controversy requirement of diversity jurisdiction would not have been satisfied if the bondholders and coupon holders had sued individually. See id., at 328-329. However, before reaching this holding, the Court expressly stated that the suit could properly be brought in federal court “if the only objection to the jurisdiction of the Circuit Court is that the plaintiff was invested with the legal title to the bonds and coupons simply for purposes of collection.” Id., at 325.
Next, in Spiller v. Atchison, T. & S. F. R. Co., 253 U. S. 117 (1920), a large number of cattle shippers assigned to Spiller (the secretary of a Cattle Raiser’s Association) their individual reparation claims against railroads they said had charged them excessive rates. The Federal Court of Appeals held that Spiller could not bring suit because, in effect, he was an assignee for collection only and would be passing back to the cattle shippers any money he recovered from the litigation. In a unanimous decision, this Court reversed. The Court wrote that the cattle shippers’ “assignments were *284 absolute in form” and “plainly” “vest[ed] the legal title in Spiller.” Id., at 134. The Court conceded that the assignments did not pass “beneficial or equitable title” to Spiller. Ibid. But the Court then said that “this was not necessary to support the right of the assignee to claim an award of reparation and enable him to recover it by action at law brought in his own name but for the benefit of the equitable owners of the claims.” Ibid. The Court thereby held that Spiller’s legal title alone was sufficient to allow him to bring suit in federal court on the aggregated claims of his assignors.
Similarly, in Titus v. Wallick, 306 U. S. 282 (1939), this Court unanimously held that (under New York law) a plaintiff, an assignee for collection, had “dominion over the claim for purposes of suit” because the assignment purported to “ ‘sell, assign, transfer and set over’ the chose in action” to the assignee. Id., at 289. More importantly for present purposes, the Court said that the assignment’s “legal effect was not curtailed by the recital that the assignment was for purposes of suit and that its proceeds were to be turned over or accounted for to another.” Ibid.
To be clear, we do not suggest that the Court’s decisions in Waite, Spiller, and Titus conclusively resolve the standing question before us. We cite them because they offer additional and powerful support for the proposition that suits by assignees for collection have long been seen as “amenable” to resolution by the judicial process. Steel Co., 523 U. S., at 102.
Finally, we note that there is also considerable, more recent authority showing that an assignee for collection may properly sue on the assigned claim in federal court. See, e. g., 6A Wright & Miller § 1545, at 346-348 (noting that an assignee with legal title is considered to be a real party in interest and that as a result “federal courts have held that an assignee for purposes of collection who holds legal title to the debt according to the governing substantive law is the *285 real party in interest even though the assignee must account to the assignor for whatever is recovered in the action”); 6 Am. Jur. 2d, Assignments § 184, pp. 262-263 (1999) (“An assignee for collection or security only is within the meaning of the real party in interest statutes and entitled to sue in his or her own name on an assigned account or chose in action, although he or she must account to the assignor for the proceeds of the action, even when the assignment is without consideration” (footnote omitted)). See also Rosenblum v. Dingfelder, 111 F. 2d 406, 407 (CA2 1940); Staggers v. Otto Gerdau Co., 359 F. 2d 292, 294 (CA2 1966); Dixie Portland Flour Mills, Inc. v. Dixie Feed & Seed Co., 382 F. 2d 830, 833 (CA6 1967); Klamath-Lake Pharmaceutical Assn. v. Klamath Medical Serv. Bur., 701 F. 2d 1276, 1282 (CA9 1983).
D
The history and precedents that we have summarized make clear that courts have long found ways to allow assignees to bring suit; that where assignment is at issue, courts— both before and after the founding— have always permitted the party with legal title alone to bring suit; and that there is a strong tradition specifically of suits by assignees for collection. We find this history and precedent “well nigh conclusive” in respect to the issue before us: Lawsuits by assignees, including assignees for collection only, are “cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.” Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U. S. 765, 777-778 (2000) (internal quotation marks omitted).
Ill
Petitioners have not offered any convincing reason why we should depart from the historical tradition of suits by assignees, including assignees for collection. In any event, we find that the assignees before us satisfy the Article III *286 standing requirements articulated in more modern decisions of this Court.
Petitioners argue, for example, that the aggregators have not themselves suffered any injury in fact and that the assignments for collection “do not suffice to transfer the payphone operators’ injuries.” Brief for Petitioners 18. It is, of course, true that the aggregators did not originally suffer any injury caused by the long-distance carriers; the payphone operators did. But the payphone operators assigned their claims to the aggregators lock, stock, and barrel. See APCC Servs., 418 F. 3d, at 1243 (there is “no reason to believe the assignment is anything less than a complete transfer to the aggregator” of the injury and resulting claim); see also App. to Pet. for Cert. 114 (Agreement provides that each payphone operator “assigns, transfers and sets over” to the aggregator “all rights, title and interest” in dial-around compensation claims). And within the past decade we have expressly held that an assignee can sue based on his assign- or’s injuries. In Vermont Agency, supra, we considered whether a qui tarn relator possesses Article III standing to bring suit under the False Claims Act, which authorizes a private party to bring suit to remedy an injury (fraud) that the United States, not the private party, suffered. We held that such a relator does possess standing. And we said that is because the Act “effect[s] a partial assignment of the Government’s damages claim” and that assignment of the “United States’ injury in fact suffices to confer standing on [the relator].” Id., at 773, 774. Indeed, in Vermont Agency we stated quite unequivocally that “the assignee of a claim has standing to assert the injury in fact suffered by the assignor.” Id., at 773.
Petitioners next argue that the aggregators cannot satisfy the redressability requirement of standing because, if successful in this litigation, the aggregators will simply remit the litigation proceeds to the payphone operators. But petitioners misconstrue the nature of our redressability inquiry. *287 That inquiry focuses, as it should, on whether the injury that a plaintiff alleges is likely to be redressed through the litigation — not on what the plaintiff ultimately intends to do with the money he recovers. See, e. g., id., at 771 (to demonstrate redressability, the plaintiff must show a “substantial likelihood that the requested relief will remedy the alleged injury in fact” (internal quotation marks omitted; emphasis added)); Lujan, 504 U. S., at 561 (“[I]t must be likely . . . that the injury will be redressed by a favorable decision” (internal quotation marks omitted; emphasis added)). Here, a legal victory would unquestionably redress the injuries for which the aggregators bring suit. The aggregators’ injuries relate to the failure to receive the required dial-around compensation. And if the aggregators prevail in this litigation, the long-distance carriers would write a check to the aggregators for the amount of dial-around compensation owed. What does it matter what the aggregators do with the money afterward? The injuries would be redressed whether the aggregators remit the litigation proceeds to the payphone operators, donate them to charity, or use them to build new corporate headquarters. Moreover, the statements our prior cases made about the need to show redress of the injury are consistent with what numerous authorities have long held in the assignment context, namely, that an assignee for collection may properly bring suit to redress the injury originally suffered by his assignor. Petitioners might disagree with those authorities. But petitioners have not provided us with a good reason to reconsider them.
The dissent argues that our redressability analysis “could not be more wrong,” because “[w]e have never approved federal-court jurisdiction over a claim where the entire relief requested will run to a party not before the court. Never.” Post, at 302. But federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their wards; *288 receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates; and so forth. The dissent’s view of redressability, if taken seriously, would work a sea change in the law. Moreover, to the extent that trustees, guardians ad litem, and the like have some sort of “obligation” to the parties whose interests they vindicate through litigation, see post, at 304-305, n. 2, the same is true in respect to the aggregators here. The aggregators have a contractual obligation to litigate “in the [payphone operator’s] interest.” App. to Pet. for Cert. 115a. (And if the aggregators somehow violate that contractual obligation, say, by agreeing to settle the claims against the long-distance providers in exchange for a kickback from those providers, each payphone operator would be able to bring suit for breach of contract.)
Petitioners also make a further conceptual argument. They point to cases in which this Court has said that a party must possess a “personal stake” in a case in order to have standing under Article III. See Baker v. Carr, 369 U. S. 186, 204 (1962). And petitioners add that, because the aggregators will not actually benefit from a victory in this case, they lack a “personal stake” in the litigation’s outcome. The problem with this argument is that the general “personal stake” requirement and the more specific standing requirements (injury in fact, redressability, and causation) are flip sides of the same coin. They are simply different descriptions of the same judicial effort to ensure, in every case or controversy, “that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.” Ibid. See also Massachusetts v. EPA, 549 U. S. 497, 517 (2007) (“At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness” (internal quotation marks omitted)). Courts, during the past two centuries, appear to have *289 found that “concrete adverseness” where an assignee for collection brings a lawsuit. And petitioners have provided us with no grounds for reaching a contrary conclusion.
Petitioners make a purely functional argument, as well. Read as a whole, they say, the assignments in this litigation constitute nothing more than a contract for legal services. We think this argument is overstated. There is an important distinction between simply hiring a lawyer and assigning a claim to a lawyer (on the lawyer’s promise to remit litigation proceeds). The latter confers a property right (which creditors might attach); the former does not.
Finally, we note, as a practical matter, that it would be particularly unwise for us to abandon history and precedent in resolving the question before us. Were we to agree with petitioners that the aggregators lack standing, our holding could easily be overcome. For example, the Agreement could be rewritten to give the aggregator a tiny portion of the assigned claim itself, perhaps only a dollar or two. Or the payphone operators might assign all of their claims to a “Dial-Around Compensation Trust” and then pay a trustee (perhaps the aggregator) to bring suit on behalf of the trust. Accordingly, the far more sensible course is to abide by the history and tradition of assignee suits and find that the aggregators possess Article III standing.
IV
Petitioners argue that, even if the aggregators have standing under Article III, we should nonetheless deny them standing for a number of prudential reasons. See Elk Grove Unified School Dist. v. Newdow, 542 U. S. 1, 11 (2004) (prudential standing doctrine “embodies judicially self-imposed limits on the exercise of federal jurisdiction” (internal quotation marks omitted)).
First, petitioners invoke certain prudential limitations that we have imposed in prior cases where a plaintiff has sought to assert the legal claims of third parties. See, e. g., *290 Warth v. Seldin, 422 U. S. 490, 501 (1975) (expressing a “reluctance to exert judicial power when the plaintiff’s claim to relief rests on the legal rights of third parties”); Arlington Heights v. Metropolitan Housing Development Corp., 429 U. S. 252, 263 (1977) (“In the ordinary case, a party is denied standing to assert the rights of third persons”); Secretary of State of Md. v. Joseph H. Munson Co., 467 U. S. 947, 955 (1984) (a plaintiff ordinarily “ ‘cannot rest his claim to relief on the legal rights or interests of third parties’ ”).
These third-party eases, however, are not on point. They concern plaintiffs who seek to assert not their own legal rights, but the legal rights of others. See, e. g., Warth, supra, at 499 (plaintiff “generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties” (emphasis added)); see also Kowalski v. Tesmer, 543 U. S. 125 (2004) (lawyers lack standing to assert the constitutional rights of defendants deprived of appointed counsel on appeal); Powers v. Ohio, 499 U. S. 400 (1991) (permitting a criminal defendant to assert rights of juror discriminated against because of race); Craig v. Boren, 429 U. S. 190 (1976) (permitting beer vendors to assert rights of prospective male customers aged 18 to 21 who, unlike females of the same ages, were barred from purchasing beer). Here, the aggregators are suing based on injuries originally suffered by third parties. But the payphone operators assigned to the aggregators all “rights, title and interest” in claims based on those injuries. Thus, in the litigation before us, the aggregators assert what are, due to that transfer, legal rights of their own. The aggregators, in other words, are asserting first-party, not third-party, legal rights. Moreover, we add that none of the third-party cases cited by petitioners involved assignments or purported to overturn the longstanding doctrine permitting an assignee to bring suit on an assigned claim.
Second, petitioners suggest that the litigation here simply represents an effort by the aggregators and the payphone *291 operators to circumvent Federal Rule of Civil Procedure 23’s class-action requirements. But we do not understand how “circumvention” of Rule 23 could constitute a basis for denying standing here. For one thing, class actions are permissive, not mandatory. More importantly, class actions constitute but one of several methods for bringing about aggregation of claims, i. e., they are but one of several methods by which multiple similarly situated parties get similar claims resolved at one time and in one federal forum. See Rule 20(a) (permitting joinder of multiple plaintiffs); Rule 42 (permitting consolidation of related cases filed in the same district court); 28 U. S. C. § 1407 (authorizing consolidation of pretrial proceedings for related cases filed in multiple federal districts); § 1404 (making it possible for related cases pending in different federal courts to be transferred and consolidated in one district court); D. Herr, Annotated Manual for Complex Litigation §20.12, p. 279 (4th ed. 2007) (noting that “[r]elated cases pending in different federal courts may be consolidated in a single district” by transfer under 28 U. S. C. § 1404(a)); J. Tidmarsh & R. Trangsrud, Complex Litigation and the Adversary System 473-524 (1998) (section on “Transfer Devices that Aggregate Cases in a Single Venue”). Because the federal system permits aggregation by other means, we do not think that the aggregators should be denied standing simply because the payphone operators chose one aggregation method over another.
Petitioners also point to various practical problems that could arise because the aggregators, rather than the payphone operators, are suing. In particular, they say that the payphone operators may not comply with discovery requests served on them, that the payphone operators may not honor judgments reached in this case, and that petitioners may not be able to bring, in this litigation, counterclaims against the payphone operators. See Brief for Petitioners 46-48. Even assuming all that is so, courts have long permitted assignee lawsuits notwithstanding the fact that such problems *292 could arise. Regardless, courts are not helpless in the face of such problems. For example, a district court can, if appropriate, compel a party to collect and to produce whatever discovery-related information is necessary. See Fed. Rules Civ. Proc. 26(b)(1), 30-31, 33-36. That court might grant a motion to join the payphone operators to the case as “required” parties. See Rule 19. Or the court might allow the carriers to file a third-party complaint against the payphone operators. See Rule 14(a). And the carriers could always ask the Federal Communications Commission to find administrative solutions to any remaining practical problems. Cf. 47 U. S. C. § 276(b)(1)(A) (authorizing the FCC to “prescribe regulations” that “ensure that all payphone service providers are fairly compensated for each and every completed [dial-around] call”). We do not say that the litigation before us calls for the use of any such procedural device. We mention them only to explain the lack of any obvious need for the remedy that the carriers here propose, namely, denial of standing.
Finally, we note that in this litigation, there has been no allegation that the assignments were made in bad faith. We note, as well, that the assignments were made for ordinary business purposes. Were this not so, additional prudential questions might perhaps arise. But these questions are not before us, and we need not consider them here.
V
The judgment of the Court of Appeals is affirmed.

It is so ordered.

APPENDIX
Examples of cases in which state courts entertained or otherwise indicated approval of suits by assignees for collection only. References to “Pomeroy’s rule” are references to the statement of law set forth in J. Pomeroy, Remedies and Remedial Rights § 132, p. 159 (1876).
*293 1. Webb & Hepp v. Morgan, McClung & Co., 14 Mo. 428, 431 (1851) (holding that the assignees of a promissory note for collection only can bring suit, even though they lack a beneficial interest in the note, because the assignment “creates in them such legal interest, that they thereby become the persons to sue”);
2. Castner v. Austin Sumner & Co., 2 Minn. 44, 47-48 (1858) (holding that the assignees of promissory notes were proper plaintiffs, regardless of the arrangement they and their assignor had made in respect to the proceeds of the litigation, because the defendants “can only raise the objection of a defect of parties to the suit, when it appears that some other person or party than the Plaintiffs have such a legal interest in the note that a recovery by the Plaintiffs would not preclude it from being enforced, and they be thereby subjected to the risk of another suit for the same subject-matter” (emphasis added));
3. Cottle v. Cole, 20 Iowa 481, 485-486 (1866) (holding that the assignee could sue, notwithstanding the possibility that the assignor was the party “beneficially interested in the action,” because “[t]he course of decision in this State establishes this rule, viz.: that the party holding the legal title of a note or instrument may sue on it though he be an agent or trustee, and liable to account to another for the proceeds of the recovery”);
4. Allen v. Brown, 44 N. Y. 228, 231, 234 (1870) (opinion of Hunt, Comm’r) (holding that the assignee with legal title to a cause of action was “legally the real party in interest” “[ejven if he be liable to another as a debtor upon his contract for the collection he may thus make”);
5. Meeker v. Claghorn, 44 N. Y. 349, 350, 353 (1871) (opinion of Earl, Comm’r) (allowing suit by the assignee of a cause of action even though the assignors “ ‘expected to receive the amount recovered in the action,’” because the assignee, as “legal holder of the claim,” was “the real party in interest”);
*294 6. Hays v. Hathorn, 74 N. Y. 486, 490 (1878) (holding that so long as an assignee has legal title to the assigned commercial paper, the assignee may bring suit even if the assignment was “merely for the purpose of collection” and he acts merely as “equitable trustee” for the assignor, i. e., the assignor maintains the beneficial interest in the paper);
7. Searing v. Berry, 58 Iowa 20, 23, 24, 11 N. W. 708, 709 (1882) (where legal title to a judgment was assigned “merely for the purpose of enabling plaintiff to enforce the collection” and the assignor in fact retained the beneficial interest, the plaintiff-assignee could “prosecute this suit to enforce the collection of the judgment”);
8. Haysler v. Dawson, 28 Mo. App. 531, 536 (1888) (holding, in light of the “recognized practice in this state,” that the assignee could bring suit to recover on certain accounts even where the assignment of the accounts had been made “with the agreement that they were to [be] [he]ld solely for the purpose of [the litigation],” i. e., the assignor maintained the beneficial interest in the accounts (emphasis added));
9. Grant v. Heverin, 77 Cal. 263, 265, 264, 19 P. 493 (1888) (holding that the assignee of a bond could bring suit, even though he lacked a beneficial interest in the bond, and endorsing Pomeroy’s rule as “a clear and correct explication of the law”);
10. Young v. Hudson, 99 Mo. 102, 106, 12 S. W. 632, 633 (1889) (holding that an assignee could sue to collect on an account for merchandise sold, even though the money would be remitted to the assignor, because “[a]n assignee of a chose in action arising out of contract may sue upon it in his own name, though the title was passed to him only for the purpose of collection”);
11. Jackson v. Hamm, 14 Colo. 58, 61, 23 P. 88, 88-89 (1890) (holding that the assignee of a judgment was “the real party in interest” and was “entitled to sue in his own name,” even though the beneficial interest in the judgment was held by someone else);
*295 12. Saulsbury v. Corwin, 40 Mo. App. 373, 376 (1890) (permitting suit by an assignee of a note who “had no interest in the note” on the theory that “[o]ne who holds negotiable paper for collection merely may sue on it in his own name”);
13. Anderson v. Reardon, 46 Minn. 185, 186, 48 N. W. 777 (1891) (where plaintiff had been assigned a claim on the “understanding” that he would remit the proceeds to the assignor less the “amount due him for services already rendered, and to be thereafter rendered” to the assignor, the plaintiff could bring suit, even though he had “already collected on the demand enough to pay his own claim for services up to that time,” because “[i]t is no concern of the defendant whether the assignee of a claim receives the money on it in his own right or as trustee of the assignor”);
14. McDaniel v. Pressler, 3 Wash. 636, 638, 637, 29 P. 209, 210 (1892) (holding that the assignee of promissory notes was the real party in interest, even though the assignment was “for the purpose of collection” and the assignee had “no interest other than that of the legal holder of said notes”);
15. Minnesota Thresher Mfg. Co. v. Heipler, 49 Minn. 395, 396, 52 N. W. 33 (1892) (upholding the plaintiff-assignee’s judgment where that assignee “held the legal title to the demand” and notwithstanding the fact that “there was an agreement between the [assignor] and the plaintiff that the latter took the [assignment] only for collection”);
16. Wines v. Rio Grande W. R. Co., 9 Utah 228, 235, 33 P. 1042, 1044, 1045 (1893) (adopting Pomeroy’s rule and holding that an assignee could bring suit based on causes of action assigned to him “simply to enable him to sue” and who “would turn over to the assignors all that was recovered in the action, after deducting their proportion of the expenses of the suit”);
17. Greig v. Riordan, 99 Cal. 316, 323, 33 P. 913, 916 (1893) (holding that the plaintiff-assignee could sue on claims assigned by multiple parties “for collection,” stating that “[i]t is [a] matter of common knowledge that for the purpose of *296 saving expense commercial associations and others resort to this method” and repeating the rule that “[i]n such cases the assignee becomes the legal holder of a chose in action, which is sufficient to entitle him to recover”);
18. Gomer v. Stockdale, 5 Colo. App. 489, 492, 39 P. 355, 357, 356 (1895) (permitting suit by a party who was assigned legal title to contractual rights, where the assignor retained the beneficial interest, noting that the doctrine that “prevails in Colorado” is that the assignee may bring suit in his own name “although there may be annexed to the transfer the condition that when the sum is collected the whole or some part of it must be paid over to the assignor”);
19. Cox’s Executors v. Crockett & Co., 92 Va. 50, 58, 57, 22 S. E. 840, 843 (1895) (finding that suit by assignor following an adverse judgment against assignee was barred by res judicata but endorsing Pomeroy’s rule that an assignee could bring suit as the “real party in interest” even where the assignee must “account to the assignor, or other person, for the residue, or even is to thus account for the whole proceeds” of the litigation);
20. Sroufe v. Soto Bros. & Co., 5 Ariz. 10, 11, 12, 43 P. 221 (1896) (holding that state law permits “a party to maintain an action on an account which has been assigned to him for the purpose of collection, only” because such parties are “holders of the legal title of said accounts”);
21. Ingham v. Weed, 5 Cal. Unreported Cases 645, 649, 48 P. 318, 320 (1897) (holding that the assignees of promissory notes could bring suit where the assignors retained part of the beneficial interest in the outcome, and expressly noting that the assignees could bring suit even if the entire interest in the notes had been assigned to them as “agents for collection” because, citing Pomeroy and prior California cases “to the same effect,” an assignee can bring suit where he has “legal title” to a claim, notwithstanding “any contemporaneous collateral agreement” by which he is to account to the *297 assignor for part or even “the whole proceeds” (internal quotation marks omitted));
22. Citizens’ Bank v. Corkings, 9 S. D. 614, 615, 616, 70 N. W. 1059, 1060, rev’d on other grounds, 10 S. D. 98, 72 N. W. 99 (1897) (holding that where the assignee “took a formal written assignment absolute in terms, but with the understanding that he would take the claim, collect what he could, and turn over to the company the proceeds thereof less the expenses of collection,” the assignee could sue because the “rule is that a written or verbal assignment, absolute in terms, and vesting in the assignee the apparent legal title to a chose in action, is unaffected by a collateral contemporaneous agreement respecting the proceeds”);
23. Chase v. Dodge, 111 Wis. 70, 73, 86 N. W. 548, 549 (1901) (adopting New York’s rule that an assignee is the real party in interest so long as he “holds the legal title” to an assigned claim, regardless of the existence of “any private or implied understanding” between the assignor and assignee concerning the beneficial interest (internal quotation marks omitted));
24. Roth v. Continental Wire Co., 94 Mo. App. 236, 262-264, 68 S. W. 594, 602 (1902) (noting that Missouri has adopted Pomeroy’s rule and holding that the trial court did not err in excluding evidence that plaintiff was assigned the cause of action for collection only);
25. Manley v. Park, 68 Kan. 400, 402, 75 P. 557, 558 (1904) (overruling prior state cases and holding that where the assignment of a bond or note vests legal title in the assignee, the assignee can bring suit even where the assignee promises to remit to the assignor “a part or all of the proceeds” (emphasis added));
26. Eagle Mining & Improvement Co. v. Lund, 14 N. M. 417, 420-422, 94 P. 949, 950 (1908) (adopting the rule that the assignee of a note can bring suit even where the assignor, not the assignee, maintains the beneficial interest in the note);
*298 27. Harrison v. Pearcy & Coleman, 174 Ky. 485, 488, 487, 192 S. W. 513, 514-515 (1917) (holding that the assignee could bring suit to collect on a note, even though he was “an assignee for the purpose of collection only” and had “no financial interest in the note”);
28. James v. Lederer-Strauss & Co., 32 Wyo. 377, 233 P. 137, 139 (1925) (“By the clear weight of authority a person to whom a chose in action has been assigned for the purpose of collection may maintain an action thereon . . . and as such is authorized by statute in this state to maintain an action in his own name”).