In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3506

CWCAPITAL ASSET MANAGEMENT, LLC,

*Plaintiff-Appellant*,

*v.*

CHICAGO PROPERTIES, LLC, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 5029—**James B. Zagel**, *Judge*.

ARGUED MAY 24, 2010—DECIDED JUNE 29, 2010

Before EASTERBROOK, *Chief Judge*, and POSNER and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal in a dispute over a commercial mortgage requires us to decide whether the plaintiff is entitled to bring this suit in its own name, and also presents issues of contract interpretation under Illinois law. The plaintiff (and appellant), CWCapital, is a mortgage servicer; the defendants (and appellees) are Chicago Properties, which is a commercial

landlord and the mortgagor (that is, the borrower); its owners, who are guarantors of the mortgage loan; and its former tenant, the Blockbuster video-rental company. The suit claims that the servicer (standing in the lender's shoes) is contractually entitled to the money that Blockbuster paid Chicago Properties in settlement of a suit by the latter for unpaid rent. The district judge conducted a bench trial and concluded that the claim was groundless—but then, seemingly as an afterthought, ruled that the servicer was not a real party in interest; as only a real party in interest can sue in its own name, the judge dismissed the suit. Fed. R. Civ. P. 17(a).

We need to explain the servicer's role in administering a mortgage-backed security—a kind of giant bond (made famous, or rather infamous, by the financial collapse of September 2008) that is secured by a large number of mortgages, one of which is the mortgage on Chicago Properties' building. The income from the mortgages is the income of the bond. But rather than selling the bond (which might be valued at $1 billion or more—in the present case, the bond when issued was valued at $1.3 billion), its creator sells "tranches" (slices) of the bond having different rights and carrying different interest rates. In effect he breaks up the giant debt security into a number of separate, smaller bonds. For example (to simplify) he might create a senior tranche and entitle the buyer of it to the first 80 percent of any of the income generated by the mortgages. The buyer of this tranche would be safe as long as the mortgages actually yielded at least 80 percent of the principal

and interest owed by the borrowers, and therefore this buyer would be promised only a modest interest rate by the issuer of the mortgage-backed security. The buyer of the junior tranche would bear much more risk and so would be compensated by being promised a higher interest rate. The plunge in housing prices in 2007 and 2008 was so great that even buyers of the senior tranches of mortgage-backed securities lost money because there were so many mortgage defaults. But that sad story is not germane to this case.

The mortgages that secure the mortgage-backed security are placed in a securitization trust, and the trustee, or in this case the trustee's delegate (the plaintiff), is responsible for servicing them. Every mortgage needs someone to collect the borrower's monthly payments of principal and interest; make sure the property is properly insured; attend to any default, either by suing the borrower and if necessary foreclosing the mortgage or by modifying the mortgage to make its terms less onerous to the borrower; and discharge the mortgage when it is paid off (and if it is prepaid, collect the prepayment penalty if the mortgage provides for one). Ordinarily the original lender would be the servicer, or would hire one. But when hundreds of mortgages are packaged into a debt security it is infeasible for each security holder to be or to hire its own servicer. The reason is the structure of the security and specifically the conflicts of interest latent in the tranching of them.

Remember that the buyer of the senior tranche in our example (for simplicity we assume only two tranches,

though usually there are more) is entitled to receive income from all the mortgages ahead of the buyer of the junior tranche. Faced with a choice between modifying one of the mortgages and foreclosing, the servicer might make a different decision as a representative of the senior tranche holder from the decision he'd make as a representative of the junior one. Suppose a borrower gets into financial trouble and asks the servicer to modify the mortgage by reducing the monthly payment of principal and interest by 20 percent. The servicer may prefer doing this to foreclosing the mortgage, because foreclosure is costly and the market value of the property may be depressed. The holder of the senior tranche wouldn't object to the modification; the diminished income from the mortgage would still fully cover his 80 percent interest in the revenue from mortgages in the mortgage-backed security. But the holder of the junior tranche might object because he might be better off if the servicer gambled on obtaining more money by foreclosing or by holding out for a less generous modification. The servicer must balance impartially the interests of the different tranches as determined by their contractual entitlements.

CWCapital, the servicer in this case, confused matters by stating in its complaint that the trust which holds title to the mortgage on Chicago Properties' building is the real party in interest, and by arguing that by disclosing that fact it has dispelled any objection to pursuing the suit in its own name. What is true is that by disclosing who the lender is, CWCapital has enabled the district judge and us to determine that if the lender were

substituted for CWCapital, or added as an additional party, there would still be complete diversity of citizenship. But whether there is complete diversity is separate from whether a suit is being maintained by the real party in interest, or by an interloper. A lawyer for the real party in interest could not bring suit in his own name merely because he disclosed the identity of his client and acknowledged that the client, and not he, was indeed the real party in interest.

The trust holds the legal title to the mortgages. The servicer is the trust's collection agent. The delegation to it is comprehensive: the servicer "shall . . . have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable." The servicer is much like an assignee for collection, who must render to the assignor the money collected by the assignee's suit on his behalf (minus the assignee's fee) but can sue in his own name without violating Rule 17(a). See *Sprint Communications Co. v. APCC Services, Inc.*, 128 S. Ct. 2531, 2541 (2008) (dictum); *Staggers v. Otto Gerdau Co.*, 359 F.2d 292, 294 (2d Cir. 1966); *Kilbourn v. Western Surety Co.*, 187 F.2d 567, 571-72 (10th Cir. 1951).

The Supreme Court's holding in the *Sprint* case was merely that an assignee for collection has standing to sue, within the meaning of Article III of the Constitution. 128 S. Ct. at 2542; see also *W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 107-10 (2d Cir. 2008). There is no doubt about Article III

standing in this case; though the plaintiff may not be an assignee, it has a personal stake in the outcome of the lawsuit because it receives a percentage of the proceeds of a defaulted loan that it services. But in an aside on real party in interest, the Supreme Court intimated agreement with 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1545 (2d ed. 1990), that a real party in interest differs from a lawyer, or someone else with a mere power of attorney, in having a claim to the proceeds of the suit even if its claim derives from legal rather than equitable title—legal title being the sort held by a trustee. 128 S. Ct. at 2541.

Unfortunately, it is less clear than it should be whether the Pooling and Servicing Agreement between the trustee of the mortgages backing the mortgage-backed security and the servicer made the latter an assignee or a mere attorney. It says that the servicer "shall . . . have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable." The trustee shall at the servicer's "written request . . . promptly execute any limited powers of attorney and other documents furnished by the [Servicer] . . . that are necessary or appropriate to enable [the Servicer] to carry out [its] servicing and administrative duties hereunder." The trustee is thus *required* to confer on the servicer whatever authority the latter needs to perform his servicing duties, which include suing. For it is the servicer, not the trustee, who is empowered to decide whether to sue. The agreement further states that without the Trustee's written

consent, "*except* as relates to a Loan that the . . . Servicer . . . is servicing pursuant to its respective duties herein (in which case such servicer shall give notice to the Trustee of the initiation), [the Servicer shall not] initiate any action, suit or proceeding solely under the Trustee's name without indicating the . . . Servicer's . . . representative capacity." The word we've italicized indicates that the servicer *can* sue in its own name if the suit relates to a loan that it's servicing, or in the trustee's name without indicating that it's doing so in a representative capacity—implying that it is *not* doing so in a representative capacity if it is suing in regard to a servicing-related loan.

It is thus the servicer, under the agreement, who has the whip hand; he is the lawyer *and* the client, and the trustee's duty, when the servicer is carrying out his delegated duties, is to provide support. The securitization trust holds merely the bare legal title; the Pooling and Servicing Agreement delegates what is effectively equitable ownership of the claim (albeit for eventual distribution of proceeds to the owners of the tranches of the mortgage-backed security in accordance with their priorities) to the servicer. See *Greer v. O'Dell*, 305 F.3d 1297, 1302-03 (11th Cir. 2002), and cases cited there. For remember that in deciding what action to take with regard to a defaulted loan, the servicer has to consider the competing interests of the owners of different tranches of the security.

But if, contrary to what we think, the servicer is not the real party in interest in this case, there still is no need to

dismiss the suit. Rule 17(a)(3) provides that a case should not be dismissed because it has not been brought in the name of the real party of interest "until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action"; and "after ratification, joinder, or sub-stitution, the action proceeds as if it had been originally commenced by the real party in interest." The trustee (Bank of America) submitted an affidavit to the district court, which was not contradicted, ratifying the servicer's suit on the bank's behalf. The district court rejected the affidavit as untimely, because earlier the plaintiff had failed to respond to an interrogatory concerning its authority to sue. The judge's action was precipitate. The affidavit was filed in response to the defendants' motion for judgment on the pleadings, in which they argued that the plaintiff lacked standing to bring suit. So while the affidavit was submitted only three days before the trial began, it was nonetheless a timely response to the defendants' motion.

So we come to the merits.

Blockbuster is the well-known but fast-fading chain of movie rental stores. Its business model has been devastated by direct mail rental services like Netflix, by DVD vending machines, and increasingly by the direct transmission of movies to home computers and television sets. "Blockbuster Shares Fall on Chapter 11 Warning," *N.Y. Times*, Mar. 17, 2010, www.nytimes.com/2010/03/18/business/media/18blockbuster.html (visited May 31, 2010); Brooks Barnes, "Studios and Cable

Unite in Support of Video on Demand," *N.Y. Times*, Mar. 17, 2010, www.nytimes.com/2010/03/18/business/media/ 18demand.html (visited May 30, 2010); "Blockbuster's Loss Exceeds Forecast," *N.Y. Times*, Aug. 13, 2009, p. B4, www.nytimes.com/2009/08/14/business/media/ 14blockbuster.html?_r=1 (visited May 30, 2010); Sarah McBride, "Blockbuster to Shutter More Stores," *Wall St. J.*, Sept. 16, 2009, p. B1, http://online.wsj.com/article/ SB125303731573912777.html (visited May 30, 2010). Unable to make a profit at the premises that it had leased from Chicago Properties, Blockbuster abandoned the lease. Chicago Properties sued. The suit was settled by Blockbuster's agreeing to pay Chicago Properties $161,000, though it owed rent of some $471,000 for the time remaining on the lease. (The plaintiff is seeking a judgment for the full $471,000, plus attorneys' fees and costs.) Chicago Properties tried to find a substitute tenant, but failed. Nevertheless it continued to make full, timely payment of the principal and interest due each month on the mortgage.

The basis of the plaintiff's claim against Blockbuster is a "Subordination, Non-Disturbance and Attornment Agreement" (SNDA) to which Chicago Properties, Blockbuster, and the trust are parties. This is a standard agreement that defines the rights of lender and tenant in the event that the landlord defaults on his mortgage and the lender forecloses. See Scott W. Dibbs, "Looking Down the Road," *Probate & Property*, Sept.-Oct. 2008, at 49, 52-54; Arnold B. West & Sidney A. Keyles, "Does the A in SNDA Work?" *id.*, Sept.-Oct. 1993, at 54; Robert D. Feinstein & Sidney A. Keyles, "Foreclosure: Subordination, Non-

Disturbance and Attornment Agreements," *id*., July-Aug. 1989, at 38. The subordination provision subordinates the lease to the mortgage; the attornment provision requires that the tenant agree to continue the tenancy if as a result of the default and foreclosure there is a new landlord; and the nondisturbance provision assures the tenant that his lease will continue in the event of foreclosure. But nowadays, despite the name, an SNDA often and in this case contains additional provisions for the protection of the lender or the tenant.

A critical provision in this case is that the lender isn't bound by any rent that the tenant may have paid in advance, nor by any modification of the lease made without the lender's consent that reduces the term of the lease or the tenant's monetary obligations under it. The concern is that a landlord who is or foresees soon being in default may, perhaps in collusion with the tenant, collect rent far in advance, or otherwise modify the terms of the lease in a way that reduces its value to a future landlord, depriving that landlord (the foreclosing mortgagee or the purchaser of the property at the foreclosure sale) of rent for occupancy of the property by the tenant after the original landlord is no longer the owner. Joshua Stein, "Needless Disturbances? Do Non-Disturbance Agreements Justify all the Time and Trouble?" 37 *Real Property Probate & Trust J.* 701, 709-12 (2003); see, e.g., *Dime Savings Bank of New York, FSB v. Montague Street Realty Associates*, 686 N.E.2d 1340, 1341-42 (N.Y. 1997); *Prudence Co. v. 160 West Seventy-Third St. Corp.*, 183 N.E. 365, 367 (N.Y. 1932); *Kirkeby Corp. v. Cross Bridge Towers, Inc.*, 219 A.2d 343, 344-46 (N.J. Super. Ct.

Chancery 1966). What is strange about the plaintiff's invocation of this provision is that the landlord, Chicago Properties, has continued to make its monthly mortgage payments in full and so there has been no event that could trigger Blockbuster's liability under the SNDA.

Another provision requires the tenant on the lender's instructions to deliver his rent payments to the lender. The plaintiff complains that Blockbuster disregarded its instructions to do that. But the instructions were sent after the lease had been terminated, so there were no more rent payments to be made. Nor was the plaintiff injured by not receiving rent payments from Block-buster, for had it received them it would have applied them to reduce the debt that Chicago Properties owes it, and it has not presented evidence that Blockbuster's failure to direct rent to it has impaired the value of its collateral. Remember that Chicago Properties has contin-ued to make its monthly mortgage payments in full.

The claimed liability of the landlord and its owners is based on other documents—the mortgage note and the owners' guaranty of the note. The guaranty makes the owners liable for any losses to the lender arising from "gross negligence or willful misconduct . . . relating to the [mortgage] Loan and/or the Property," and (under a provision similar to a provision in the SNDA that we've already discussed) for losses arising from the misapplication or conversion of rent paid more than a month in advance. Nothing in the settlement with Blockbuster violates these provisions. The money paid in the settlement was not a payment of rent. It was a

payment in settlement of a lawsuit that sought rent for a future period, namely the remaining term of the lease after Blockbuster abandoned the premises. And although the mortgage agreement prohibits the borrower from cancelling a lease without the lender's written consent, it makes an exception for cancellations made when the borrower "is acting in the ordinary course of business and in a commercially reasonable manner." It would be odd if the defendants could be exposed to liability for doing something contemplated by the mortgage agreement. In light of Blockbuster's financial difficulties, there is no basis for thinking that Chicago Properties was being commercially unreasonable in settling with Blockbuster on the terms it did. And CWCapital argues neither that Chicago Properties violated a covenant of the loan agreements by failing to reduce the rent it charges, in order to secure a replacement tenant; or that it should have made greater efforts to find such a tenant; or (what is critical) that leaving the building unoccupied has impaired its value as security for the mortgage loan— a related point is that there is no evidence of what the building was worth either before or after Blockbuster's abandonment of the lease.

The loan was nonrecourse (with some conditions—as we're about to see). A mortgage loan is nonrecourse when the mortgage lender can't obtain damages against the borrower if the loan is defaulted and the lender can't be made whole by foreclosing on the lender's collateral. This may have given Chicago Properties an incentive to hold out for a high-paying tenant even if that reduced

the value of the collateral (its building). But that isn't argued either.

The mortgage agreement (which is separate from the mortgage note) requires the borrower to place in escrow "all funds received by Mortgagor from tenants in connection with the cancellation of any Leases, including, but not limited to, any cancellation fees [or] penalties." This language covers the proceeds of the $161,000 settlement of Chicago Properties' suit against Blockbuster for unauthorized abandonment of the lease; and breach of this provision is a default under the mortgage agreement, requiring immediate payment of the unpaid balance of the mortgage note. But the plaintiff is not seeking enforcement of the mortgage agreement. (Perhaps Chicago Properties has complied with the escrow provision; it seems not to have, but the record is unclear.) The only relief it seeks against Chicago Properties is a money judgment for the entire amount of rent owed by Blockbuster, plus attorneys' fees and costs.

A final issue involves the district court's award of attorneys' fees to Blockbuster on the basis of a provision in the SNDA that "should any action or proceeding be commenced to enforce any provisions of this Agreement or in connection with its meaning, the prevailing party in such action shall be awarded, in addition to any other relief it may obtain, its reasonable costs and expenses, not limited to taxable costs and reasonable attorney's fees." The plaintiff argues that Blockbuster is not a prevailing party because it lost on a counterclaim charging a violation of a provision of the SNDA which

said that "Tenant [Blockbuster] shall not be joined as a party/defendant in any action or proceeding which may be instituted or taken by reason or under any default by Landlord in the performance of the terms, covenants, conditions and agreements set forth in the Mortgage." The district court found this provision inapplicable because the claims against Blockbuster arose under the SNDA independently of any claims against Chicago Properties under the mortgage. But all that Blockbuster could have obtained from its counterclaim were attorneys' fees and costs. That was an unimportant part of the case, so, on balance, Blockbuster was indeed a prevailing party.

The judgment is reversed with directions to enter judgment for the defendants.

REVERSED WITH DIRECTIONS.