**ECF NORTH RIDGE ASSOCIATES, L.P. and TCI 9033 Wilshire Boulevard, Inc., Appellants,**

**v.**

**ORIX CAPITAL MARKETS, L.L.C., U.S. Bank, N.A. a/k/a Bancorp, N.A., as Trustee For The Mortgage Pass–Through Certificates, Series 1996–C3, and Wells Fargo Bank, N.A., a/k/a Wells Fargo Bank, Minnesota, N.A., as Trustee for the Mortgage Pass–Through Certificates, Series 99–C1, Appellees.**

**No. 05–09–00066–CV.**

Court of Appeals of Texas, Dallas.

March 14, 2011.

Rehearing Overruled April 19, 2011.

Ryan Lurich, Friedman & Feiger, L.L.P., Jonathan J. Cunningham, Shamoun & Norman, LLP, Dallas, TX, for appellants.

P. Michael Jung, Strasburger & Price, LLP, Talmage Boston, Windstead, Secrest & Minick, P.C., Dallas, TX, for appellees.

Before Justices O'NEILL, LANG, and MURPHY.

## OPINION ON REHEARING

Opinion By Justice MURPHY.

Appellee ORIX Capital Markets, L.L.C. filed a motion for rehearing, and appellant ECF North Ridge Associates, L.P. filed a response. The motion for rehearing is granted, and we withdraw our substituted opinion issued January 19, 2011 and vacate our judgment of that date. The following is now the opinion of the Court.

Borrowers ECF and TCI 9033 Wilshire Boulevard, Inc. contest the legal and factual sufficiency of the evidence to support the trial court's finding that ECF and TCI breached their loan agreements by not procuring certified terrorism insurance on the properties securing their debts. Separately, ECF appeals the trial court's calculation of default interest, and TCI challenges ORIX's standing, as servicer, to sue for breach of contract. We modify the trial court's judgment to account for the proper accrual date for default interest against ECF and affirm the judgment as modified.

### Background

At the time of the dispute, ECF and TCI were the owners of commercial real estate properties. ECF owned the North Ridge Apartments property in Dallas, Texas, which is low-income housing built in the late 1960s and located within a couple miles of the Dallas Galleria and surrounding office towers. TCI was the owner of the Wilshire Medical Building in Los Angeles, California, which is located less than a mile from Rodeo Drive in Beverly Hills. ECF and TCI share the same principal and, during the relevant time, the same property management company, Prime Income Asset Management, Inc. Prime also functioned as their contractual advisor, responsible for risk management. Mortgage loans originated in 1995 for the apartment

property and 1999 for the medical building.

Both loans were pooled and securitized after origination, becoming Commercial Mortgage–Backed Security loans (CMBSs).[1] ORIX was the servicer on behalf of the loan pools' trustees for both loans and was therefore responsible for collecting monthly payments of principal and interest, monitoring whether the property was properly insured, and addressing any issues of default under the loan documents.

 The loan documents required specified insurance on the properties, including "all-risk" insurance. "All-risk" insurance covers any peril not specifically excluded in the policy. *See Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 n. 11 (5th Cir.1990). At the time of the loan originations, neither ECF's nor TCI's all-risk policy excluded coverage for damage caused by acts of terrorism. Yet after the September 11, 2001 terrorist attacks in New York City, Washington, D.C., and rural Pennsylvania, insurance companies, including those for ECF and TCI, began excluding from their all-risk policies any coverage for damage caused by terrorist acts.

In a series of letters beginning in 2002, ORIX informed ECF and TCI certified terrorism insurance was required under the relevant loan documents. "Certified terrorism insurance" is coverage for certain terrorist acts that have been certified by the United States Secretary of Treasury in concurrence with the United States Secretary of State and Attorney General under the Terrorism Risk Insurance Act of 2002, Pub. L. 107–297, §§ 101–108, 116 Stat. 2322, 2322–36 (2002) (the TRIA). The correspondence continued, with ORIX sending "final notice" to both ECF and TCI in 2004. ECF and TCI shared the same principal and risk management and therefore received the same information on the cost of certified terrorism insurance—premiums purportedly ran as high as $20,000 annually. The loan balances in 2004 were approximately $4.8 million for ECF and $6.6 million for TCI, and both were unwilling to obtain such insurance. Evidence at trial showed that had they obtained actual bids for the insurance, the annual premiums would have been $1,412.40 for ECF and $345.63 for TCI.

When ECF and TCI refused to obtain certified terrorism insurance, ORIX declared defaults under the loan documents. ECF and TCI responded by filing suit against ORIX for breach of contract and declaratory relief. ORIX answered and counterclaimed, also alleging breaches of

---

**1.** A CMBS is a type of bond secured by a large number of commercial mortgages pooled together, often on the basis of the similarity of the mortgage loan documents and geographical location and type of collateral. The creator of the CMBS then issues a series of "slices" of the bond (usually called tranches) that vary in yield, duration, and payment priority. The income of the mortgage is the income of the bond, with the investors in the highest-rated tranches being paid first; if there is a shortfall in the income from the mortgages, the investors with the lowest-rated tranches may not receive any income at all. The mortgages that secure the CMBS are placed in a securitization trust, and the trustee is responsible for servicing those mortgages. Sometimes, however, trustees of CMBSs delegate their rights, authority, and monitoring responsibilities to master or special servicers pursuant to pooling and servicing agreements. The servicer is obligated to balance competing interests of the various tranches with the borrowers' various contractual obligations, but is ultimately contractually obligated to service the loan in accordance with the interests of the trustees as well as the holders of the various tranches. *See CWCapital Asset Mgmt., LLC v. Chicago Props., LLC,* 610 F.3d 497, 499–501 (7th Cir.2010), also discussed below.

contract and requesting a declaration that ECF and TCI had breached the insurance provisions in the relevant loan documents and seeking default interest from the date of the alleged breach. Once it received the counterclaim, ECF elected to pay off its loan. In connection with this payoff, ECF first obtained certified terrorism insurance in April 2005 for an annual premium of $1,787.00 and paid the default interest under protest. About the same time, TCI sought approval from ORIX to have another party assume its loan. To complete the assumption, TCI also paid default interest under protest. The lawsuit continued.

In late 2007, ECF and TCI joined as codefendants U.S. Bank, N.A. a/k/a Bancorp., N.A., as Trustee for the Mortgage Pass–Through Certificates, Series 1996–C3, and Wells Fargo Bank, N.A., a/k/a Wells Fargo Bank, Minnesota, N.A., as Trustee for the Mortgage Pass–Through Certificates, Series 99–C1. Previously, in 2006, ORIX had acquired ECF's loan formerly held by U.S. Bank and was both the owner and servicer of the loan. Yet Wells Fargo still held TCI's loan, and TCI added a defense that ORIX did not have standing to assert any claims against TCI. The trustees answered, essentially parroting ORIX's allegations and asserting ORIX had the right to recover default interest and attorney's fees attendant to enforcing ECF's and TCI's loan documents.

After thirteen days of bench trial in late 2008, the trial court rendered judgment for appellees and awarded ORIX default interest and attorney's fees. ECF and TCI appeal.

### Standard of Review

For their legal-sufficiency challenge, ECF and TCI must demonstrate on appeal there is no evidence to support the trial court's adverse findings. *Croucher v.*

*Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *Pete Dominguez Enters., Inc. v. County of Dallas,* 188 S.W.3d 385, 387 (Tex.App.-Dallas 2006, no pet.). Under a no-evidence point, we consider the evidence in the light most favorable to the verdict, indulging every reasonable inference in support. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). A legal insufficiency challenge fails if there is more than a scintilla of evidence to support the verdict. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998) (sub. op.). If, however, the evidence offered to prove a vital fact is so weak as to do no more than create a surmise or suspicion of its existence, the evidence is no more than a scintilla and is legally no evidence. *Kindred v. Con/ Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

For their factual sufficiency challenge, ECF and TCI must demonstrate there is insufficient evidence to support the adverse finding. *Pulley v. Milberger,* 198 S.W.3d 418, 426 (Tex.App.-Dallas 2006, pet. denied). In reviewing a factual sufficiency challenge, we consider and weigh all of the evidence in support of and contrary to the trial court's finding and will set aside the verdict only if the evidence supporting the verdict is so slight, or the evidence against it so strong, that the finding is manifestly unjust and quite clearly wrong. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965) (finding factually insufficient if "the evidence supporting the verdict is so weak or the evidence to the contrary is so overwhelming" that finding should be set aside and new trial ordered); *see also Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam) (for factual sufficiency review, verdict set aside only if "clearly wrong and unjust"); Hall, *Standards of Appellate Review in Civil Appeals,* 34 St. Mary's L.J. 1, 172 (2002). The amount of evidence necessary to affirm a

judgment is far less than that necessary to reverse a judgment. *Pulley*, 198 S.W.3d at 427.

## Discussion

ECF and TCI challenge the findings and conclusions requiring them to maintain certified terrorism insurance. ECF separately challenges the trial court's judgment awarding ORIX default interest beginning May 13, 2004, the date of ORIX's first "final notice" letter. TCI further challenges ORIX's standing as the account servicer to sue for breach of contract. We begin with TCI's challenge to ORIX's standing.

### Standing

TCI argues that ORIX, as the mortgage servicer and not the holder of TCI's note, has no standing to sue TCI. ORIX responds that the pooling and servicing agreement (PSA) between it and the trustee of TCI's CMBS conveys standing to sue for default of the loan documents.

■ Standing is a component of subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex.1993). Whether a trial court has subject matter jurisdiction is a matter of law, which we review de novo. *See id.* at 446; *see also Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004). Whether a plaintiff possesses standing to assert a particular claim depends on the facts pleaded and the cause of action asserted. *Everett v. TK–Taito, L.L.C.*, 178 S.W.3d 844, 853 (Tex.App.-Fort Worth 2005, no pet.); *see also M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 707–708 (Tex.2001). We construe the petition in favor of the pleader and, if necessary, review the entire record to determine if any evidence supports standing. *See Tex. Air Control Bd.*, 852 S.W.2d at 446. The standing doctrine "focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome." *Austin Nursing Ctr. v. Lovato*, 171 S.W.3d 845, 848 (Tex.2005) (quoting 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND MARY KAY KANE, WRIGHT, MILLER; & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1559, 441 (2d ed. 1990)).

■ No Texas case directly addresses the standing question before this Court, although ORIX cites *ORIX Capital Markets, LLC v. La Villita Motor Inns, J.V.*, 329 S.W.3d 30, 39–42 (Tex.App.-San Antonio 2010, pet. abated) for guidance. There, the court concluded the record contained sufficient evidence ORIX Capital Markets had proven its right to enforce a note as the current "special servicer" and pursuant to a servicing agreement containing language similar to the PSA in this case. Recently, a federal appeals court addressed the very issue of whether a mortgage servicer had standing to pursue claims against a borrower for an alleged default under a mortgage loan to which the servicer was not a party. *See CWCapital Asset Mgmt., LLC v. Chicago Props., LLC*, 610 F.3d 497 (7th Cir.2010).

In *CWCapital*, the court addressed whether a mortgage servicer, CWCapital, was entitled to bring suit against the commercial landlord (the borrower) and its former tenant for moneys the former tenant paid the landlord in settlement of a separate dispute. *Id.* at 499. Examining the servicer's role in administering a mortgage-backed security, the court explained how a "servicer must balance impartially the interests of the different tranches as determined by their contractual entitlements." *Id.* at 499–500. The court turned to the language of CWCapital's PSA with its trustee, stating the servicer is the trust's collection agent because it "shall . . . have full power and authority, acting

alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable," thus making the delegation of the trustee's rights to the servicer "comprehensive." *Id.* at 500 (alterations in original). According to the court: "There is no doubt about Article III standing in this case [of a servicer bringing suit]; though the plaintiff may not be an assignee, it has a personal stake in the outcome of the lawsuit because it receives a percentage of the proceeds of a defaulted loan that it services." *Id.* at 501.

The court next turned to the issue of whether CWCapital was a real party in interest. *CWCapital,* 610 F.3d at 501. Examining CWCapital's PSA, the court cited various provisions indicating the servicer had the right and responsibility to bring suit against the borrower, including the "full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable." *Id.* The trustee also was obligated, at the servicer's written request, to execute any limited powers of attorney and other documents furnished by the servicer and necessary or appropriate to enable the servicer to carry out its servicing and administrative duties under the PSA. The court concluded the trustee was required to confer necessary authority on the servicer to bring suit, "[f]or it is the servicer, not the trustee, who is empowered to decide whether to sue." *Id.* Regarding the right of the servicer to sue in its own name, the court emphasized the following PSA language excepting out the required trustee consent when suing pursuant to servicing duties:

> [W]ithout the Trustee's written consent, "*except* as relates to a Loan that the . . . Servicer . . . is servicing pursuant to its representative duties herein (in which

case such servicer shall give notice to the Trustee of the initiation), [the Servicer shall not] initiate any action, suit or proceeding solely under the Trustee's name without indicating the . . . Servicer's . . . representative capacity."

*Id.* (stating italicized "except" indicates "the servicer *can* sue in its own name if the suit relates to a loan that it's servicing, or in the trustee's name without indicating that it's doing so in a representative capacity—implying that it is *not* doing so in a representative capacity if it is suing in regard to a servicing-related loan") (emphasis and alterations in original). The court concluded:

> It is thus the servicer, under the agreement, who has the whip hand; he is the lawyer *and* the client, and the trustee's duty, when the servicer is carrying out his delegated duties, is to provide support. The securitization trust holds merely the bare legal title; the Pooling and Servicing Agreement delegates what is effectively equitable ownership of the claim (albeit for eventual distribution of the proceeds to the owners of the tranches of the mortgage-backed security in accordance with their priorities) to the servicer. For remember that in deciding what action to take with regard to a defaulted loan, the servicer has to consider the competing interests of the owners of different tranches of the security.

*Id.* at 501–02 (internal citations omitted; emphasis in original).

Here, the language of ORIX's PSA is almost identical to that in *CWCapital.* The PSA gives ORIX "full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable." Similarly, the trustee is required to support

ORIX's efforts to service the pooled loans: "Trustee shall execute any powers of attorney and other documents delivered to it by [ORIX] and necessary and appropriate to enable [ORIX], as the case may be, to carry out its servicing and administrative duties hereunder...." Further, the PSA permits ORIX to institute lawsuits in its own name: "without the Trustee's written consent[, ORIX shall not,] except as relating to a Mortgage Loan which [ORIX], as applicable, is servicing pursuant to [its] respective duties herein ... initiate any action, suit or proceeding solely under the Trustee's name without indicating [ORIX's] representative capacity...." We therefore conclude under the same reasoning as in *CWCapital,* ORIX had standing to bring this lawsuit against TCI either in its own name or as a special servicer.[2]

### Requirement of Terrorism Insurance

■ Having concluded ORIX had standing to bring suit, we now turn to the question of whether ECF and TCI were contractually obligated to procure terrorism insurance. In response to ECF's and TCI's challenge to the legal and factual sufficiency of evidence to support the trial court's judgment, ORIX contends that terrorism insurance is required under two separate provisions of the relevant loan documents—"other insurance" and "all-risk insurance."

■ To understand ECF's and TCI's contractual obligations, we analyze the relevant loan documents. Our primary concern in contract interpretation is to ascertain the meaning and determine what obligations are imposed on the par-

ties. *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). We examine and consider the entire writing as a whole to harmonize and give effect to all the provisions so that none will be rendered meaningless. *Id.* Terms are given their plain, ordinary, and generally accepted meaning unless the instrument shows the parties used terms in a technical or different sense. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996).

We address the "other insurance" clauses of the loan documents first because those provisions are dispositive. Subsection 1.4(f) of ECF's Mortgage and Security Agreement provides in relevant part:

> Mortgagor shall, at Mortgagor's expense, maintain in force and effect on the Property at all times while this Mortgage continues in effect the following insurance:
>
> . . .
>
> (f) Such other insurance on the Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required by Mortgagee against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

TCI's Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing contains a similar provision:

> Borrower shall, at its own cost and expense, maintain the following insurance

---

2. TCI cited several of our cases for the proposition, "[i]n order to establish standing to maintain a breach of contract action, a plaintiff must show either third-party beneficiary status or privity." *See, e.g., OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.,* 234 S.W.3d 726, 738 (Tex.App.-Dallas 2007, pet. denied). Reviewing these cases, we conclude they do not control the current circumstances in which a pooling and servicing agreement specifically gives the servicer the right and responsibility to institute suit against a borrower either in its own name or on behalf of the trustee.

coverage with respect to the Property during the term of this Deed of Trust:

. . .

(h) Miscellaneous. Such other insurance coverages, in such amounts, and such other forms and endorsements, as may from time to time be required by Lender and which are customarily required by institutional lenders for similar properties, similarly situated, including, without limitation, coverages against other insurable hazards including, by way of example only, earthquake, sinkhole and mine subsidence, which at the time are commonly insured against and generally available.

Although not identical, the language of these contracts is clear: ORIX as servicer may require ECF and TCI to obtain certain insurance coverage—such as certified terrorism insurance—if such perils are commonly insured against for similar properties, similarly situated. ECF and TCI do not challenge whether certified terrorism insurance was "generally available"; instead, they argue certified terrorist acts were not "commonly insured against" for properties similar to the apartment property or medical building. Their burden under their legal sufficiency challenge is to demonstrate there is no evidence to support the adverse finding certified terrorist acts were commonly insured against for similar properties, similarly situated. *See Croucher*, 660 S.W.2d at 58. Alternatively, under their factual sufficiency challenge, ECF and TCI must show the evidence supporting the trial court's finding is so slight as to render the finding clearly wrong and unjust. *See Garza*, 395 S.W.2d at 823; Hall, *supra*, at 172.

During the course of the thirteen-day bench trial, ORIX primarily relied on a survey published in June 2004 by the Mortgage Bankers Association. The MBA study was conducted in response to a request by the United States Treasury Department to gather information regarding the "effectiveness" of the TRIA. In its survey, the MBA analyzed over 122,000 commercial and multifamily loans across major investor classes (CMBSs, life companies, Fannie Mae, Freddie Mac, FHA and others, with minimal representation by commercial banks and savings and loans), with the average loan size being $5.34 million. Of the $656 billion of commercial and multifamily mortgages studied—32% of the total market—terrorism insurance was required by the mortgage investor or servicer for 93.9% of the loans, and terrorism insurance was in place for 83.5%. In the portfolios studied, terrorism insurance was required for 100% of the balance serviced for CMBS and other affiliates. The press release regarding this survey summarized the results as showing the "impact on all property types across U.S." and stating "[t]his indicates that terrorism insurance coverage is wide and deep, not just for trophy properties but across the entire commercial/multifamily real estate spectrum."

The testimony at trial regarding this MBA survey further explored ORIX's conclusion that certified terrorist acts were commonly insured against for properties situated similarly to the apartment property and medical building. In addition to the conclusion terrorism insurance was required for over 93% of the loans surveyed, ORIX's expert testified the survey was statistically reliable—over 122,000 commercial and multifamily loans were surveyed nationally without restriction to specific geographical locations. ORIX's expert further testified that because of the breadth of the survey, it necessarily included properties similar to the medical building and the apartment property.

Other evidence admitted at trial included a January 2005 paper published by the

Congressional Budget Office entitled "Federal Terrorism Reinsurance: An Update" and a report of the United States Department of the Treasury entitled, "Assessment: The Terrorism Risk Insurance Act of 2002." These reports corroborated the findings reported in the MBA survey that CMBSs almost uniformly required terrorism insurance. The MBA survey was cited in the CBO paper for the conclusion "nearly all of the balances being serviced for CMBSs—the largest segment of the commercial/multifamily mortgage market—were required to have terrorism insurance in place...." Further, the CBO paper included reference to "one recent deal, involving a $1.3 billion CMBS composed of 106 loans and 120 properties (including a number of retail shopping malls across the country), [in which] 99.7 percent of the balance underlying the CMBS had terrorism insurance in place." In the referenced Treasury Department assessment, the effectiveness of the TRIA was analyzed through a comprehensive set of nationwide surveys of policyholders and insurers between 2002 and 2005. Policyholders surveyed represented almost 1.1 million organizations across markets that were not part of the federal government and had at least ten employees, representing various market shares and businesses. The assessment also showed a 54% take-up rate[3] in 2004, the time of ORIX's demands on ECF and TCI to procure certified terrorism insurance. To account for variations among properties, results were refined according to property replacement values: for properties with replacement values under $50 million (the replacement values for the apartment property and medical building), the take-up rate in 2004 was 53%. To account for geographical differences for the same period, take-up rates for policyholders were 61% in large cities such as Dallas, and 67% in high-risk cities designated by the Department of Homeland Security such as Los Angeles. Results were segregated further by industrial sector: business—which included industries in real estate and rental and leasing; professional, scientific, and technical services; and management of companies and enterprises—had a 65% take-up rate in 2004.

Both ECF and TCI complain no attention was paid to specific criteria of the relevant properties when ORIX determined certified terrorism insurance was required under the loan documents; rather, they assert, ORIX simply made a blanket decision to require certified terrorism insurance for all loans it serviced. But, ORIX's expert testified the statistically reliable MBA survey—which concluded over 93% of commercial and multifamily mortgages required terrorism insurance—*necessarily* included properties similar to the medical building and the apartment property. Accordingly, although some of the evidence did not reflect 100% terrorism coverage, we conclude the evidence supported the trial court's findings that certified terrorist acts were commonly insured against for properties situated similarly to the apartment property and medical building: commercial and multifamily properties that were collateral for securitized loans, had similar replacement values, were in specific industry sectors, and were located in Dallas and Los Angeles. *See, e.g., BFP 245 Park Co. v. GMAC Commercial Mortg. Corp.,* 12 A.D.3d 330, 332, 786 N.Y.S.2d 425 (N.Y.App.Div.2004) ("On these motions, the lender did demonstrate that the risk was 'commonly' insured

---

**3.** The take-up rate is the share of policyholders who purchased any amount of terrorism risk insurance.

against; it was not necessary that the risk be universally insured against, so plaintiff's demonstration that some buildings in Manhattan did not have terrorism coverage was not dispositive on this issue.").

ECF and TCI offered no evidence contradicting these statistics, instead contending the commonality analysis in the context of CMBSs was inappropriate because the relevant loan documents were not securitized at the time of execution. The relevant loan documents, however, do not require ORIX's request for "other insurance" be examined with circumstances frozen as of 1995 or 1999, the time of the parties' contracts. Instead, the contract language and placement in the loan documents indicate the intent of flexibility. ECF was required to maintain such "other insurance" as may "from time to time" be required, which "at the time" are commonly insured against for properties similarly situated. Although the clauses are not identical, in material respects TCI likewise was required to maintain such "other insurance" as may "from time to time" be required, which "at the time" are commonly insured against and generally available. Located at the end of the sections discussing insurance requirements, and following the prior subsections detailing specific requirements, the "other insurance" provisions of both ECF's and TCI's loan documents effectively function as "catch-all" clauses that provide the lender flexibility for changing or unforeseen circumstances or insurance needs encountered during the duration of the loans. Indeed, appellants conceded such a characterization: at trial, ECF referred to the "other insurance" provisions as "catch-all" and appellants' insurance expert agreed. Neither the contract language nor the testimony supports ECF's and TCI's contentions the commonality analysis must be determined according to the circumstances at the time of origination.

Nor do ECF and TCI support their contention ORIX was required under the terms of the relevant loan documents to engage in individualized commonality analyses. They have identified no language in the loan documents mandating such a requirement, and the plain language requires the requested insurance "be" commonly insured against for similarly situated properties. Stated differently, no individualized inquiry is a condition to determining whether the other insurance is commonly required for similar properties. *See, e.g., BFP 245*, 12 A.D.3d at 332, 786 N.Y.S.2d 425 ("Absent the requisite conditional language, it was not a condition precedent to the lender's right to request other insurance for it to show that such coverage was for a risk 'commonly insured against.'") (internal citation omitted).

We conclude ECF and TCI have failed to meet their burdens of showing there is either no evidence or insufficient evidence to support the trial court's findings that ORIX could, under the "other insurance" provisions of the loan documents, require certified terrorism insurance. We also conclude the evidence is legally and factually sufficient to support the trial court's finding that ECF and TCI breached their loan agreements by not procuring the insurance. Based on these conclusions, we do not reach the remaining issues regarding the "all-risk insurance" provisions. *See* Tex.R.App. P. 47.1.

### Calculation of Default Interest

ECF also contests the trial court's finding default interest accrued from May 13, 2004, the date of ORIX's first "final notice" letter. ECF asserts both this letter and a July 14, 2004 letter from ORIX gave additional cure periods and any default interest must be calculated from the expiration of the last cure period: July 19,

2004. ORIX responds that default interest is due immediately upon default and any cure periods offered in its letters do, not alter the language of the loan documents.

Our analysis of the loan documents begins with section 3.1 of the note, which provides:

> It is hereby expressly agreed that ... should any other default occur under any of the Loan Documents which is not cured within any applicable grace or cure period, then a default shall exist hereunder, and in such event the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued thereon, shall, at the option of Lender and without notice to Borrower, at once become due and payable and may be collected forthwith.

Section 3.3 also provides, "[s]o long as any default exists hereunder ... such default interest shall be immediately due and payable."

The Mortgage and Security Agreement is one of the "Loan Documents" as defined in ECF's note. Because the note contains no definition for a "default," we look to that security agreement. Section 4.16 of the security agreement also provides, "A default hereunder which has not been cured within any applicable grace or cure period shall be a default under each of the other Loan Documents." Subsection 2.1(b) also provides: "The occurrence of any of the following events shall be a default hereunder: ... [ECF] fails to provide insurance as required by Section 1.4 hereof ... and such failure continues for five (5) days after written notice thereof from [ORIX] to [ECF]." [4]

To determine the accrual date for default interest, we must resolve whether a "default" exists as of the date of ORIX's "final notice" that ECF must obtain certified terrorism insurance, or only upon the expiration of any cure period. The plain language of the note states defaults exist only after expiration of the cure period— "should [a] default occur under any of the Loan Documents which is not cured within any applicable grace or cure period, *then* a default shall exist." (Emphasis added.) Subsection 2.1(b) of the security agreement plainly sets a cure period—five days. Considering both agreements together, as we must, no default occurred under the note until expiration of the five-day cure period. *See Adams v. First Nat. Bank of Bells/Savoy*, 154 S.W.3d 859, 868 (Tex. App.-Dallas 2005, no pet.) (op. n.p.t.) (construing promissory note and deed of trust together).

ORIX asserts the language of the loan documents making any default interest "immediately due and payable" provides for no cure period before interest accrues. The loan documents provide otherwise. Specifically, section 3.3 of the note defining the rate of default interest contemplates the existence of a default first, after which default interest accrues and "shall be immediately due and payable." Because a default exists only upon the expiration of the five-day cure period, no default interest becomes "immediately due" until the cure period expires. The original parties to these transactions were sophisticated; had they chosen to define the default date as the date the borrower failed to maintain insurance, they would have done so.

ECF maintains ORIX's correspondence was an "indulgence" under the loan documents that extended ECF's cure period;

by ignoring these indulgences when calculating the amount of default interest, the trial court erred. Yet section 4.1 of ECF's own note states specifically any indulgences granted by ORIX shall not be construed as a waiver of its rights. ORIX had the right to grant ECF indulgences and extensions under the loan documents in an effort to provide time for ECF to cure its default. ECF refused any attempt to cure until April of 2005 when it sought to pay off its outstanding loan balance. Had ECF cured its default within the time periods allowed by ORIX, no default would have occurred. Because it did not cure, ORIX's indulgences did not prevent ORIX's right to collect default interest pursuant to the first "final notice" letter. We conclude the trial court erred when it awarded default interest from the date of ORIX's correspondence, May 13, 2004, without accounting for the five-day cure period under the loan documents.

### Other Issues

ECF also identified sub-issues in its brief as to appellees' breach of contracts and mitigation of damages. TCI similarly raised issues regarding mitigation and Wells Fargo's failure to plead the element of damages. ECF and TCI did not brief any of these issues. Accordingly, the issues are waived, and we will not address them. *See* TEX.R.APP. P. 38.1; *see also Ranger Ins. Co. v. State*, 312 S.W.3d 266, 270–71 (Tex.App.-Dallas 2010, pet. dism'd) ("When a party fails to brief a complaint adequately, it waives the issue on appeal.").

### Conclusion

With respect to the calculation of default interest, we modify the trial court's judgment to reflect the five-day grace period following May 13, 2004. Specifically, we modify the trial court's judgment to provide the amount of default interest paid by ECF that ORIX may retain (modifying $217,027.38 to $213,645.47) and the commencement date for prejudgment interest against ECF (modifying May 13, 2004 to May 18, 2004). *See* TEX.R.APP. P. 43.2(b). The trial court's judgment is affirmed in all other respects.