**Opinion issued October 29, 2015**



In The

# Court of Appeals
For The
# First District of Texas
_____

## NO. 01-14-00677-CV
_____

## PETER TSAI AND BARBARA TSAI, Appellants

## V.

## LIBERTY MUTUAL INSURANCE COMPANY, Appellee

On Appeal from the 269th District Court
Harris County, Texas
Trial Court Case No. 2013-61457-A

## MEMORADUM OPINION

This appeal arises from an insurance-coverage dispute between Liberty Mutual Insurance Company and its insureds, Peter Tsai and Barbara Tsai, involving the applicability of a water-damage exclusion in an all-risk homeowner's policy. Each side filed a motion for summary judgment. The trial court denied the Tsai's motion, granted Liberty Mutual's motion, and rendered final judgment in

Liberty Mutual's favor. In five issues on appeal, the Tsais contend that the trial court erred in denying them summary judgment and in granting summary judgment to Liberty Mutual.

We affirm.

## Background

The facts underlying this case are undisputed. In 2006, the Tsais purchased their home in a residential gated community. The house is a three-level, wood-frame structure, constructed with a concrete slab-on-grade foundation. The exterior of the dwelling is a combination of conventional stucco cladding and stone veneer. The perimeter of the home has a combination of pavers, planters, and grass.

In March of 2012, the Tsais noticed what they later described as "ridges" on the wood floors in the living room of their home. By August 2012, the damage had spread across the living room, and the wood flooring was separating.

The Tsais made a claim with Liberty Mutual under their homeowners' policy regarding the damage to their wood floors. Liberty Mutual began an investigation to determine the source and the cause of the damage. Liberty Mutual first eliminated a plumbing leak as the cause of the damage. Liberty Mutual retained HSA Engineers & Scientists ("HSA") to evaluate the Tsais's home and to

uncover "the cause and extent of water ingress," which had resulted in the flooring damage.

Following its evaluation of the Tsais's home, HSA prepared a report of its findings, signed by two professional engineers. Both Liberty Mutual and the Tsais agree with the findings in the HSA report.

HSA observed that the wood flooring in the Tsais' living room "displayed an uneven appearance where the edges on the top of the board were higher than the top of the center of the boards, which is commonly referred to as a 'cupped' condition." The report states,

> There was evidence that the cupped appearance of the boards was reasonably attributed to moisture migrating under the wood floor from the planter at the north edge/perimeter of the Tsai property . . ., which . . . did not feature detailing for drainage, was near the same elevation as the top of the first level wood floor, and was higher than the foundation slab of the Tsais' residence.

The report provides a description of the home's wood floors, including the following:

> The wood floor had been elevated above the foundation slab surface utilizing a screed system, and measurements indicated that the distance between the top of the wood floor boards and the foundation slab surface measured on the order of 2–1/2 inches. These measurements are consistent with a one-inch thick wood floor board installed over a 1–1/2 [inch] thick screen member. . . . There was no ready access below the first level wood floor.

The report continues, "Mr. Tsai stated that the first one to two feet of land north of the edge/perimeter of the Tsai foundation are part of the land parcel

3

owned by the Tsai family. However, Mr. Tsai stated that adjacent landowners commonly are allowed to use/modify this strip of land." The Tsais informed HSA that in 2007 their neighbors to the north "installed a swimming pool, concrete patio areas, and gravel planters in areas of the north neighbors' yard, and a planter with shrubs were installed in the strip of land along the north edge/perimeter of the Tsai residence."

The report also provides,

> Mr. Tsai stated that the previous north neighbor (original owner in 2006 per HCAD) did not reportedly water the shrubs and the planter significantly. However, the more recent north neighbor (purchased the dwelling in February 2010 per HCAD) reportedly watered significantly . . . . The planter that lined the north edge/perimeter of the Tsai foundation featured a watering system, but it was not clear when this watering system was installed.

The report further describes the planter located on the north side of the house:

> The north edge/perimeter of the Tsai residence foundation had been lined with a planter that featured shrubs set in a mulch base. The planter was edged with metal that extended above the level of the mulch to separate the planter from the adjacent concrete patio. Relative elevations of the concrete patio revealed a general slope down from the northwest to the southeast, and there were consistently lower elevations at the south edge of the patio (near the Tsai residence) compared to the north edge of the patio (near the north neighbor dwelling). Elevations of the planter revealed that the top of the mulch was between 0.76 feet and 0.85 feet, which is similar or higher than the top of the finished wood floor at the interior of the Tsai residence adjacent to this area (about 0.79 feet to 0.81 feet along the north edge of the living room). The top of the continuous metal

edging also measured between around 0.78 feet for the west half of the planter and tapered down to about 0.66 feet. . . . .

The report explained HSA's findings more specifically, as follows:

HSA's investigation reasonably correlated the detailing along the north edge/perimeter of the dwelling as a source of moisture migration below the wood floor of the Tsai residence. Relative elevations and visual observations revealed that the planter, which lined the north edge/perimeter of the foundation . . ., was built up to a level near the same height as the top of the finished wood floor at the interior of the Tsai residence . . . . The top of the continuous metal edging that lined the north edge of this planter also was at a similar elevation as the top of the wood floor at the interior. Thus, the top of the foundation, which is nominally 2-1/2 inches below this level, was below the top of the planter that lined the north edge/perimeter of the foundation. There were no alternative means of drainage observed in this planter (surface drains, French drains, etc.), thus, water that drains into the planter can travel the path of least resistance for drainage. The path of least resistance, here, is for water to seep between the top of the foundation and the sill plate and migrate to the lower interior area below the wood floor of the Tsai residence. . . .

HSA understands that this condition has progressed recently to the owners' surprise. HSA understands that the north neighbor purchased the dwelling in February 2010. Soon after that time[,] the greater Houston, Texas area experienced an extended and extensive drought. Thus, the supplemented moisture applied to the shrubs during watering at this time was not sufficient to build to a sufficient level (as a result of the lack of drainage in the planter) to overwhelm the detailing and migrate below the first level wood floor. HSA also understands that the previous owner did not water significantly and that the pool/patio construction was not completed until 2007. Thus, the return of rainfall to the Houston, Texas area in late 2011 and early 2012, the drainage of the north patio/planter, watering of shrubs in the north planter, and the detailing of this area resulted in a combination of factors sufficient to result in moisture migration/accumulation below the first level wood floor of the Tsai residence.

5

In sum, HSA concluded that the cupped appearance in the wood floors was caused by water migration from the planter to underneath the flooring.

Based on the HSA's investigation, Liberty mutual denied the Tsais' homeowners' policy claim. Liberty Mutual's denial letter stated, "Based on the results of the [HSA] engineer's report, we are unable to assist you with your homeowner's claim. Unfortunately, the policy does not cover damages resulting from surface water entering the home at ground level." Liberty Mutual referred the Tsais to language in the insurance policy that excluded coverage for "water damage," including damage from "surface waters."

The Tsais disagreed with Liberty Mutual's denial of coverage based on the water-damage exclusion. The Tsais sued Liberty Mutual and the neighbor, who had installed the planter. The Tsais asserted that Liberty Mutual had breached the insurance contract and had engaged in deceptive trade practices.

Liberty Mutual answered the suit and filed a traditional motion for summary judgment. In the motion, Liberty Mutual argued that it had not breached the insurance contract as a matter of law because the Tsais' claim was not covered by the policy. Liberty Mutual asserted that the claim fell within the policy's water damage exclusion. Liberty Mutual also claimed it was entitled to summary judgment regarding the Tsais' extra-contractual claims. In support of its motion, Liberty Mutual offered the homeowner's policy and the HSA report.

The Tsais responded to Liberty Mutual's motion for summary judgment and also filed their own motion for partial summary judgment. The Tsais asserted that their claim did not fall within the policy's water-damage exclusion, as a matter of law. Alternatively, the Tsais asserted that their reasonable interpretation of the exclusionary language must be adopted because the exclusionary language is ambiguous. The trial court signed two orders: one order denying the Tsais' motion for partial summary judgment and one order granting Liberty Mutual's motion for summary judgment. The trial court then severed the Tsais' claims against their neighbor, rendering a final judgment against the Tsais' claims in favor of Liberty Mutual.

This appeal followed. The Tsais identify five intertwined issues. With respect to their breach of contract claim, they aver that the trial court erred in rendering summary judgment for Liberty Mutual and in denying their motion for summary judgment. The Tsais assert that their homeowner's claim for the damaged wood flooring did not fall within the policy's water-damage exclusion, as Liberty Mutual maintains.

**Summary Judgment**

**A.    Standard of Review**

The well-settled principles governing the review of summary judgments apply in insurance coverage cases. *Hanson v. Republic Ins. Co.*, 5 S.W.3d 324,

7

327 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). We review a grant of summary judgment de novo. *SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 641 (Tex. 2015) (citing *State v. Ninety Thousand Two Hundred Thirty–Five Dollars & No Cents in U.S. Currency ($90,235)*, 390 S.W.3d 289, 292 (Tex. 2013)). A party moving for traditional summary judgment has the burden to prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *SeaBright Ins. Co.*, 465 S.W.3d at 641 (citing *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009)).

We review summary judgment evidence "in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *SeaBright Ins. Co.*, 465 S.W.3d at 641 (citing *Mann Frankfort Stein & Lipp Advisors, Inc.*, 289 S.W.3d at 848). When, as here, both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Id.* at 641–42 (citing *Comm'rs Court of Titus Cty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997)). Each party filing a motion for summary judgment must carry its burden; neither party may prevail

because the other failed to discharge its own burden. *Pratt v. Amrex, Inc.*, 354 S.W.3d 502, 505 (Tex. App.—San Antonio 2011, pet. denied).

**B.    Analysis**

In the all-risk homeowner's policy issued to the Tsais, the relevant provisions are as follows:

> SECTION I – PERILS INSURED AGAINST
> A. Coverage A –Dwelling And Coverage B –Other Structures
> 1.    We insure against risk of direct physical loss to property described in Coverages A and B.[1]
> 2.    We do not insure, however, for loss:
> a. Excluded under Section I –Exclusions;
>
> . . . .
>
> SECTION I –EXCLUSIONS
> A.    We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> . . . .
>
> 3.    Water Damage
> Water Damage means:
> a.    Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;
>
> . . . .

---

[1]    Here, the Tsais's home was covered property as a dwelling under Coverage A.

> c. Water or water-borne material below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building . . . .
caused by or resulting from human or animal forces or any act of nature.

The Tsais are quick to point out that this is an all-risk policy. All-risk insurance covers any peril not specifically excluded in the policy. *ECF N. Ridge Assocs., L.P. v. ORIX Capital Mkts., L.L.C.*, 336 S.W.3d 400, 403 (Tex. App.—Dallas 2011, pet. denied). Liberty Mutual asserts, however, that the peril in this case was expressly excluded in the policy. Throughout the summary-judgment proceedings and on appeal, Liberty Mutual has maintained that the Tsais' loss was caused by either "surface water" or by water "below the surface of the ground," as those terms are used in water-damage exclusion.

The Tsais claim that Liberty Mutual's denial of coverage constitutes breach of contract; that is, a breach of the insurance policy.[2] As they did in the trial court, the Tsais assert that their loss was not caused by surface water or water below the surface of the ground; rather, it was caused by "generic water." In other words, the

---

[2] To prevail on a breach of contract claim, a plaintiff must show (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)). Here, the element at the center of the dispute is whether Liberty Mutual breached the insurance contract by improperly denying coverage.

Tsais contend that the damage was not caused by a type of water identified within the water-damage exclusion. For this reason, they assert that the damage to their floors is a covered, non-excluded loss under the policy. The Tsais claim that, at a minimum, the exclusionary language is latently ambiguous when viewed in the context of the undisputed findings presented in the HSA report.

To determine who is correct in this case, we interpret the Tsais' homeowners' policy according to the rules of contract construction. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003); *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740–41 (Tex. 1998). Our primary goal, therefore, is to give effect to the written expression of the parties' intent. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). To this end, we construe the terms of the contract as a whole and consider all of its terms, not in isolation, but within the context of the contract. *Id.*; *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994). In construing an insurance contract, its terms are given their "ordinary and generally accepted meaning." *Sec. Mut. Cas. Co. v. Johnson*, 584 S.W.2d 703, 704 (Tex. 1979).

If a policy provision has only one reasonable interpretation, it is unambiguous and we must construe it as a matter of law. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006). If an exclusion has more than one reasonable interpretation, we must construe it in favor of the insured as long as that

11

construction is not unreasonable. *Id.* A policy provision is not ambiguous merely because different parties or different courts have interpreted it differently. *Id.*

An ambiguity in a contract generally will fall into one of two categories: "patent" or "latent." "A patent ambiguity is evident on the face of the contract." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). "A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *Id.*

Because it is dispositive, we begin by discussing the language within the water-damage exclusion that states losses caused by "surface water" are not covered under the policy. The Tsais do not argue that the term "surface water" is patently ambiguous. Instead, the Tsais indicate that exclusionary language becomes latently ambiguous when viewed in the context of HSA's undisputed determination that the loss was caused when water migrated from the neighbor's planter to underneath their hardwood floors. We do not agree with the Tsais that "surface water" is latently ambiguous. As discussed below, there is only one reasonable conclusion in this case: surface water caused the Tsais' loss.

In the insurance context, surface water has been "defined as water or natural precipitation diffused over the surface of the ground until it either evaporates, is absorbed by the land, or reaches channels where water naturally flows." *State*

*Farm Lloyds v. Marchetti*, 962 S.W.2d 58, 61 (Tex. App.—Houston [1st Dist.] 1997, pet. denied) (citing *Transamerica Ins. Co. v. Raffkind*, 521 S.W.2d 935, 939 (Tex. Civ. App.—Amarillo 1975, no writ); *Emp'rs' Fire Ins. Co. v. Howsley*, 432 S.W.2d 578, 580 (Tex. Civ. App.—Amarillo 1968, no writ)); *see also Valley Forge Insurance Co. v. Hicks Thomas & Lilienstern*, *L.L.P.*,174 S.W.3d 254, 258 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) ("Surface water is generally defined as that which is derived from falling rain . . . and is diffused over the surface of the ground. . . ."); *Sun Underwriters Ins. Co. of N.Y. v. Bunkley*, 233 S.W.2d 153, 155 (Tex. Civ. App.—Fort Worth 1950, writ ref'd) (explaining surface water generally defined as derived from falling rain or melting snow and diffused over surface of ground, following no defined course or channel, not gathered into natural body of water, and lost by evaporation, percolation, or natural drainage).

The water that migrated under the Tsais' flooring derived from rain and sprinkler water that had fallen onto the surface of the planter. After falling on the planter's surface, the water did not follow a defined path or channel. Instead, it passed freely, moving through the upper two to three inches of mulch, a manufactured product commonly placed over the soil of flower beds. As referenced in the HSA report, it was not until the planter was "overwhelmed" with water that it migrated under the floors, which were at or slightly below the elevation of the mulch. That is, the water that entered the home was either water

13

that had pooled and collected within the surface layer of the mulch before being released, or it was newly introduced water that served as the tipping point to release water from the saturated mulch. The water that reached the Tsais' home was not absorbed "by land." Given these characteristics, the water that migrated under the Tsais' flooring was surface water, as defined by the cases cited *supra*.

The Tsais cite three reasons why the water was not surface water: (1) the water was not "natural precipitation"; (2) the water was not diffused over the surface of the ground; and (3) alternatively, presuming it was surface water, it lost its character as surface when "it was absorbed by the mulch in the flower bed and drained into the Tsais' house."

We begin by addressing the Tsais' assertion that the water was not "surface water" because it was not natural precipitation. Although acknowledging that rainwater contributed to the water damage, the Tsais aver that the primary source of the water that damaged their floors came from the sprinkler system and not from natural precipitation. The Tsais' argument, however, is not supported by the HSA report or by the policy language.

The HSA report indicates that the sprinkler water from the planter did not migrate from the planter to underneath the flooring until the drought ended and rainfall returned. This shows that natural-occurring rainwater was a causative factor of the loss in this case. Importantly, the exclusion involved in this case

contains the following lead-in clause: "We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributed concurrently or in any sequence to the loss." This provision serves to preclude coverage under the policy when a claimed loss is caused by a combination of covered and excluded perils. Thus, the fact that sprinkler water "contributed concurrently or in any sequence to the loss" along with the rainwater does not remove the Tsais' claimed loss from the exclusion. *Cf. Valley Forge*, 174 S.W.3d at 259 (noting that surface-water exclusion applied, even though surface water had flowed into underground man-made tunnels, because exclusion contained lead-in clause).

In addition, as Liberty Mutual points out, the exclusionary language does not require surface water to be "natural precipitation." To contrary, the exclusion applies when the water damage is "caused by or resulting from human or animal forces or any act of nature." In other words, the exclusion is not limited to naturally-occurring precipitation, as the Tsais claim.

The Tsais also assert that the water was not surface water because it was not "diffused and flowing over the surface of the ground when it infiltrated" their home. In this regard, *Crocker v. American National General Insurance Co.* is instructive. 211 S.W.3d 928, 936 (Tex. App.—Dallas 2007, no pet.). There, the court determined whether the meaning of "surface water," as used in an exclusion

15

in a homeowner's policy, reasonably included rain water that had collected on the surface of a raised patio before flowing into the insured's home. *Id.* The court concluded that "an average reasonable person would not limit surface water to rain falling only on dirt and not on any paved surfaces or other structures." *Id.*

In *Valley Forge*, we determined that water which flowed from the surface through pedestrian tunnels and other manmade structures before flooding the insured's premises did not lose its character as surface water. *See Valley Forge*, 174 S.W.3d at 258. We explained, "Surface water is generally defined as that which is derived from falling rain . . . and is diffused over the surface of the ground. . . . Such waters are not divested of their character as surface waters by reason of their flowing from the land on which they first make their appearance onto lower land in obedience to the law of gravity." *Id.* (citing *Bunkley*, 233 S.W.2d at 155). We held that the insured's claim was excluded under a surface-water exclusion, similar to the one in this case. *Id.* at 258–59.

Applying the reasoning employed in *Crocker* and *Valley Forge*, the water that flowed through the mulch—like water flowing over or through a manmade structure—did not lose its character as surface water. The bare fact that the water migrated from the planter to the Tsais' home did not change its essential character as surface water.

16

The Tsais alternatively assert that, even if the water was surface water, it lost its character as such when it was "absorbed by the mulch in the flower bed and drained into the Tsais' house." As noted, the exclusion has a lead-in clause stating that water damage from surface water is excluded if the loss was caused directly or *indirectly* by surface water. Thus, whether the loss was caused directly by surface water once the mulch had reached its saturation point or whether it was caused by water released by the mulch once other surface water drained into the planter, the loss would be either directly or indirectly caused by surface water.

We conclude that the Tsais' loss was caused by surface water. Accordingly, the loss was excluded under the terms of the policy. We hold that the trial court properly granted Liberty Mutual's motion for summary judgment and properly denied that of the Tsais.

We overrule the Tsais' issues relevant to determining whether the water was surface water and whether the trial court properly ruled on the motions for summary judgment.[3]

---

[3]  Because the surface-water issues are dispositive, we do not reach the Tsais' third issue, which discusses the exclusionary language precluding coverage for a loss caused by water below the ground.

## Conclusion

We affirm the judgment of the trial court.[4]

Laura Carter Higley
Justice

Panel consists of Justices Jennings, Higley, and Brown.

---

[4]    The Tsais did not specifically address on appeal the trial court's grant of summary against them on their extra-contractual claims. However, when insurance coverage is resolved in the insurer's favor, extra-contractual claims, including DTPA claims, do not survive. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010).